In the Matter of FINANCIAL CORPORATION, Bankrupt.

A. G. BECKER & COMPANY, INC., Loeb, Rhoades & Co., First Wisconsin National Bank of Milwaukee, European American Bank & Trust Company, European American Banking Corporation, Southeast First National Bank of Miami, First National Bank of Miami, Michigan National Bank, Sun First National Bank of Orlando, First National Bank of South Carolina, First National Bank of Minneapolis, Wells Fargo Bank, and First National Bank of Louisville, Claimants

v.

D.W. GILMORE, trustee in bankruptcy, Respondent.

Bankruptcy No. 75B–1623–W–4.

United States Bankruptcy Court, W. D. Missouri, W. D.

Dec. 28, 1981.

Stephen B. Strayer, Kansas City, Mo., for respondent.

Harry P. Thomson, Kansas City, Mo., for claimants.

### ORDER OVERRULING DEFENSE OF IMPOSSIBILITY OF PERFORMANCE BY REASON OF GOVERNMENTAL INTERFERENCE IN THE FORM OF JUDICIAL ORDERS

DENNIS J. STEWART, Bankruptcy Judge.

The trustee in bankruptcy has objected to the claims of the above claimants on the ground, *inter alia*, that they are based on contracts with respect to which the performance of the bankrupt corporation was excused by reason of impossibility of performance occasioned by governmental interference. By means of its prior orders, this court has consolidated these claims for a hearing on this issue and appointed Harry P. Thomson, Esquire, as lead counsel for the claimants. Subsequently, on September 3, 1981, the hearing was conducted, with Mr. Thomson appearing as counsel for the claimants and the respondent trustee in bankruptcy appearing personally and by counsel, Stephen B. Strayer, Esquire. The claimants rested on the evidence which had been adduced in the hearing of September 3, 1981. But the trustee, by counsel, at the conclusion of the hearing conducted on that date, requested that a further opportunity be granted for the purpose of developing further testimony based upon disclosures made to him for the first time in the course of the hearing of this matter through the testimony of Eldon R. Miller, former president of the bankrupt corporation. Lead counsel for the claimants opposed this further discovery and hearing, citing the long period of time which the trustee had had to develop this evidence. But this court, in its order filed on September 21, 1981, noted that the files and records in this case demonstrated that discovery from Eldon R. Miller had proven difficult to obtain in the past and that this past difficulty lent credence to the trustee's claims of inability to obtain information prior to the eve of the hearing

of September 3, 1981.[1]  Therefore, the court granted the parties 30 days in which to take the telephonic depositions of certain persons whom the testimony of Eldon R. Miller on September 3, 1981, disclosed to be possibly relevant witnesses.[2]

But thirty days and more have since passed without the parties' taking advantage of this additional opportunity for discovery which counsel for the trustee requested at the conclusion of the hearing of September 3, 1981.  Therefore, this court must make its determination of this issue from the evidence which was adduced in the hearing of September 3, 1981.

### Findings of Fact

The evidence then adduced warrants the following findings of fact.  In the last part of June 1975 and the early part of July 1975, rumors began to spread across the community of government securities traders in New York and elsewhere that Financial Corporation, formerly a respectable trader on that market, was under investigation by the Securities and Exchange Commission and was no longer considered safe to do business with.  This came to the attention of the president of Financial Corporation, Eldon R. Miller, first on or about July 1, 1975, when he heard word of the growing rumors.[3]  Then, in quick succession, he learned that some of the firms with which he had formerly done business, among them several primary and secondary dealers, would no longer do business with him.[4]  Others reported to him the rumors which had been circulating in the government bond community about Financial Corporation.[5]

At length, on July 7, 1975, Mr. Miller was contacted by an officer of the Securities and Exchange Commission[6] by telephone who asked Mr. Miller generally about the operations of Financial Corporation and informed Mr. Miller that he was entitled to have the assistance of counsel before making any reply.[7]  Mr. Miller, according to his testimony, declined to give any response at

1.  Thus, it has been noted in the prior orders of this court that, when Eldon R. Miller was formerly a formal respondent in this matter, and the court attempted to discover the factual bases of his conclusionary objections to these claims, the respondent filed notices of appeal from the orders making such inquiries rather than respond to them.  And there currently pends before the court a motion for sanctions against Mr. Miller for his alleged failure and refusal to attend a deposition which lead counsel for the claimants had set on notice to him.

2.  In its order of September 21, 1981, the court granted the parties 30 days in which to take the telephonic depositions of Messrs. Harvey Sperry, Michael Tartgoff and John Ointsinger, "or any of them," observing that: "In the hearing of September 3, 1981, Eldon R. Miller disclosed that the lawyers who advised him to execute the consent and also participated in the discussions with agents of the Securities and Exchange Commission were Harvey Sperry, Michael Tartgoff and John Ointsinger."

3.  See tr. 11 of the hearing whereupon Mr. Miller testified that "I believe the first direct evidence I had was late June, I'd say the 29th or the 30th, possibly July 1.  Dick Fontaine told me he had a call . . . from, I believe it was Fran Scott at Garvin Bantel . . . money broker . . . saying that he understood the S.E.C. was going to close us down the next week, and there had been some strange things going on.  In fact, I couldn't understand how, how much information was getting out about us in the street as to our position in the market."

4.  See Mr. Miller's testimony beginning at tr. 12 of the hearing of September 3, 1981, to the following effect: "(P)eople (were) refusing to buy or sell merchandise, either buy from or sell to us merchandise.  And when I'm speaking of merchandise, I'm talking about government bills, bonds and notes, and in some cases, agencies, such as Federal Home Loan obligations . . . First, Banker's Trust (refused to buy or sell), and I'm speaking now of the primary dealers, then it was followed in quick order by Blyth Eastman, First Boston, Merrill Lynch; later by secondary dealers, Cantor Fitzgerald, Carol McInty and McInley; and later by Mahlon Andrus because his clearing bank, which was Banker's Trust, refused to clear any more transactions where Financial Corporation was involved, or that was Financial Corporation merchandise, let's say."  (sic.)

5.  See tr. 14 of the hearing of September 3, 1981.

6.  Said to be Michael Drake, of the Securities and Exchange Commission.  See tr. 15 of the hearing of September 3, 1981.

7.  See tr. 15 of the hearing of September 3, 1981.

that time but rather stated that he preferred to contact his attorney.

Mr. Miller then engaged the services of the law firm of Willkie, Farr and Gallagher in New York City to represent Financial Corporation in dealing with the Securities and Exchange Commission. Pursuant to this engagement, Mr. Miller, on July 7, 1975, left the offices of Financial Corporation and went to the offices of Willkie, Farr and Gallagher where he was to remain during the business hours which passed between that date and the date of July 10, 1975. He conferred with certain attorneys in the law firm, Michael Tartgoff, John Ointsinger, and Harvey Sperry, answering the questions which they had apparently been asked by members or agents of the Securities and Exchange Commission and showing them some of the records of Financial Corporation. Messrs. Tartgoff, Ointsinger, and Sperry then held separate conferences with members or agents of the Securities and Exchange Commission. Mr. Miller was not permitted to be present during any part of any of the conferences of his attorneys with the Securities and Exchange Commission members or agents. Therefore, he could not testify as to what transpired during these conferences. But he states that very shortly after they began his attorneys began to advise him that it would be wise for him to accede to the demand of the Securities and Exchange Commission for the appointment of a receiver under section 78u, Title 15, United States Code, to handle the affairs of Financial Corporation.[8] The advice included the prognostication that, if he did not consent to the measures being requested by the Securities and Exchange Commission—including a preliminary injunction against his operation of the business [9] and the appointment of the receiver—they would be able to obtain it through court action over his oppo-

sition anyway. As the successive conferences wore on through the first part of July 1975, the advice of the attorneys along these lines became more incessant and more insistent. They came to be accompanied by the attorneys' stating that they thought they might be able to secure for themselves the appointment as receiver and thereby permit Financial Corporation to prosecute its business more or less as usual.

Mr. Miller states that it is his belief, based upon these statements and actions of his counsel, that his counsel had made some sort of deal with the Securities and Exchange Commission as a result of which they no longer represented the interests of Financial Corporation and Mr. Miller, but rather those of the law firm of Willkie, Farr and Gallagher which were now perceived by them to be advanced by the issuance of the preliminary injunction and the appointment of a receiver.

At length, around mid-day on July 10, 1975, Mr. Miller's lawyers accompanied him to the offices of the Securities and Exchange Commission in New York City. The ostensible purpose of this visit was to consent to and arrange for the implementation of the preliminary injunction and the appointment of the receiver. After his lawyers briefly introduced him to certain officers of the Commission, Mr. Miller, according to his testimony in this matter, was left alone in an office for a period of two or three hours for the purpose of considering a written consent to the preliminary injunction and appointment of a receiver. He spent the time, he states, "commiserating with himself" and reflecting upon the pros and cons of executing the consent form. He considered, in part, statements made to him by at least one other dealer in government securities, which had been to the effect that the Securities and Exchange Commission won "almost every case" and that,

---

**8.** It is held that the courts have inherent power to issue orders appointing receivers and trustees at the instance of the Securities and Exchange Commission in order to effectuate this statute. See, e.g. *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082 (2d Cir. 1972).

**9.** As it later developed, see page 501, *infra,* of this memorandum, the injunction did not purport to enjoin performance of these contracts.

to oppose the demands of the Commission would, in this light, only result in purposeless expense for Financial Corporation. He further considered the steady and, as noted above, unrelenting advice of his lawyers that, if the consent were not executed, the Commission would nevertheless achieve its ends and purposes in accordance with the governing law. And he also considered that the recent explosion of rumors about Financial Corporation's alleged inability to do business in the government securities market had been crippling to its business. Therefore, after this long period of solitary reflection, he signed the consent form, which provided as follows, because, considering the above, he felt that "it would be better" for Financial Corporation:

> "The defendant Eldon Miller, having read and understood the terms of the attached Judgment of Preliminary Injunction and Appointment of Temporary Receiver, acknowledges that he is represented by counsel and upon advice of counsel, admits the jurisdiction of this court over him and over the subject matter of this action, admits the service of the Summons and Complaint, waives the filing of an answer and the entry of findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure and enters a general appearance, and hereby consents, without admitting or denying the substantive allegations of the plaintiff's Complaint herein, to the entry of the attached Judgment of Preliminary Injunction entered against him without further notice, and the appointment of a Temporary Receiver.

> "The defendant further states that no render, offer, promise or threat of any kind whatsoever has been made by plaintiff Securities and Exchange Commission, or any member, officer, agent or representative thereof, in consideration of the foregoing consent."

After Mr. Miller affixed his signature to the above quoted consent, Mr. Ointsinger, on behalf of the law firm of Willkie, Farr and Gallagher, affixed his signature after the word, "approved." *Inter alia*, the "order of preliminary injunction and appointment of temporary receiver" then entered by the United States District Court for the Southern District of New York purported to restrain and enjoin "the defendants Financial Corporation and Eldon Miller" from "engaging in securities transactions while unable to meet their financial responsibilities"; from "entering into obligations while unable to meet such obligations when due, or at a time when there could be no reasonable certainty of their ability to meet such obligations when due"; and from "failing to maintain adequate books and records." In the text of the same order, Spencer S. Marsh, Jr., who was and is not a member of the law firm of Willkie, Farr and Gallagher, was appointed as temporary receiver and was authorized:

> "to take custody of all books, records, papers, documents and securities (cancelled, issued and unissued) and all other business papers of defendant Financial wherever located and to maintain and keep current such items, (but the temporary receiver shall make available to the plaintiff, Securities and Exchange Commission, such books and records as may be requested by the Securities and Exchange Commission) to have full power to marshal, collect and take charge of all assets and property of defendant Financial wherever located, and *pay all just claims and creditors* of said defendant and authorizing and empowering the temporary receiver to employ such attorneys, accountants, securities experts and other employees as may be necessary in discharging the authority vested in said temporary receiver by this Order; and it is further

> "ORDERED, that said temporary receiver shall be empowered to *take all reasonable steps to assure that all repurchase agreements are honored by Financial and if not, that any collateral sold by the holder of the repurchase agreement shall be sold at a price reasonably related to the current market price for such collateral.* In taking such steps the receiver is authorized to confer with appropriate sources of information, including the Federal Reserve Bank of New York.

"IT IS FURTHER ORDERED that *all holders of 'repurchase agreements' shall give reasonable notice to said receiver of their intention to sell such collateral and the approximate value to be received from such sale.*

"IT IS FURTHER ORDERED that immediate telegraphic notice be given to all known holders of repurchase agreements and other known creditors of Financial of the terms of this order and their obligations thereunder." (Emphasis added.)

See *Securities and Exchange Commission v. Financial Corporation and Eldon Miller,* Civil Action No. 75 Civil 3341 (S.D.N.Y. July 10, 1975). The temporary injunction and temporary receivership thus effected remained in effect throughout a time period which included the dates for Financial Corporation's performance on nearly all the contracts underlying the claims now at bar.[10] On August 18, 1975, Mr. Miller filed a petition on behalf of Financial Corporation for voluntary bankruptcy in this court. Much later, the hearing on the permanent injunction sought by the Securities and Exchange Commission was conducted by the United States District Court for the Southern District of New York in *Securities and Exchange Commission v. Miller, supra.* The hearing was apparently held at the instance of Mr. Miller,[11] who states that, at the time the hearing was held, on April 17, 1978, he was better able financially to defray the costs and expenses of litigation than he was at the time of his execution of the written consent to the preliminary injunction on July 10, 1975. Over two years after the hearing had begun, the United States District Court for the Southern District of New York made its determination in *Securities and Exchange Commission v. Miller,* 495 F.Supp. 465 (S.D.N.Y. June 27, 1980), denying the permanent injunction. As is here material, it was found that, although the bankrupt corporation and Mr. Miller had committed a violation of the securities laws in that they had not disclosed to an inquiring customer relevant financial information, a permanent injunction, for the following reasons, was unnecessary to ensure nonrecurrence of the violation. The pertinent portion of the opinion of the United States District Court for the Southern District of New York are as follows:

"When Levin requested a financial statement, Miller led him to believe that he could expect one at the end of June. Although the evidence is hardly overwhelming, at least this much appears to have occurred, regardless of the accuracy of Levin's recollection, and regardless of Miller's precise words. In light of the state of Miller's records, and the absence of any evidence to indicate that preparation of such a statement ever began, the Court concludes that Miller must have intended to throw Levin off the scent. And in light of Levin's inquiry, which indicated his presumption that Financial

---

**10.** In respect of the time for performance of the several contracts which were made with the claimants in this matter, the claimant Sun First National Bank of Orlando moved for summary judgment in its favor prior to the hearing of September 3, 1981. (The motion was filed on July 28, 1981.) In that motion, it is contended, in part, that, with respect to the claim of the Sun First National Bank of Orlando, "the performance date from which the damages arose was prior to July 10, 1975 and therefore, the voluntariness of the consent decree has no applicability to the claim of Sun First National Bank of Orlando for the reason that impossibility of performance could not be a defense as a matter of law." The respondent trustee has opposed the granting of summary judgment on this issue, contending that "Mr. Miller ... was effectively precluded from (business decisions) from about noon on July 7, 1975 to the after-noon of July 10, 1975 due to the fact that he was, during virtually the whole of that period, engaged in negotiations with his attorneys and the SEC resisting the imposition of an injunction and receivership." An issue of fact was thereby made, but, as found in the text of this memorandum, the evidence of coercion in this regard is lacking, although Mr. Miller in fact testified that he was in his lawyers' offices throughout this period of time. The motion for summary judgment of the First National Bank of Orlando must accordingly be denied because of the existence of a genuine issue of material fact and the matter then resolved in favor of the First National Bank of Orlando by reason of this order.

**11.** See 495 F.Supp. at 476.

maintained customary records, Miller's partial response, even if true, was intentionally misleading in that it failed to disclose that Financial did not then, or ever, have what was customarily considered a 'financial statement.' Only if Miller had said nothing at that point could he have avoided a duty to disclose the full truth. But any statement which induced Levin to continue his false presumption would have been deceptive, and a clear violation of the Rule's express prohibition against omitting facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' 17 C.F.R. 240.10b–5(b) . . . . . Notwithstanding Levin's assertion that he would have continued to do business with Financial in any event, the Court finds that Miller's nondisclosure was material. While the truth might not have deterred Levin from further transactions with Financial, he or any other reasonable investor in his shoes certainly would have viewed it as significantly altering the total mix of information available. Levin admitted as much. And, especially during periods of market fluctuations, it would probably have made Levin much more careful to get an adequate margin in his repos with Financial, and much less willing to hold off selling Financial's collateral on the open market if it failed to meet any of its obligations.

"This leaves the question of whether an injunction should issue against the defendant. On this issue, the Court of Appeals for this circuit has in several recent cases emphasized 'the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.' . . . the Commission has shown only one isolated manipulative or deceptive act. And even that one is factually close and raises difficult factual issues, given the nature of the market in which Miller traded, and the expectations of others in that market. Moreover, this Court's finding of deceptiveness is predicated upon Levin's inquiry into Financial's records, which the Commission in its Answers to Interrogatories, seemed to suggest had not occurred. Finally, the Commission has failed to adduce any evidence whatsoever that Miller ever before or after that incident violated the antifraud or any other provisions of the securities laws. Nor has it shown that Miller is now active or has any intention or capability to resume his activity in the repo or any other securities or money market. Accordingly, the Court finds that there is insufficient likelihood of future violations to justify an injunction here."

495 F.Supp. at 482, 483, and 484

### Conclusions of Law

■ In the course of the above and foregoing findings of fact, the court has emphasized the portions of the order of the United States District Court for the Southern District of New York granting the preliminary injunction and appointing the temporary receiver which provide that the performance of Financial Corporation on existing contracts was not restrained or enjoined. Rather, the temporary receiver was empowered to marshal the financial resources of Financial Corporation and apply them to the repurchase agreements on which Financial Corporation was liable. Thus, unless Financial Corporation was at the time insolvent (an issue on which the respondent has contended to the contrary), it would appear that the order granting the preliminary injunction and appointing the temporary receiver did not make performance impossible in any sense; that, in fact, if there were current ability to pay and perform, it was commanded under the terms of the order which was issued by the United States District Court for the Southern District of New York. And, accordingly, performance was not made impossible by these orders, but rather by the filing of the petition in this court for relief under the Bankruptcy Act on August 18, 1975.

On the other hand, if there was an inability to perform the contracts by reason of insolvency, then, as is demonstrated under the standards below elaborated, the defense

of impossibility by reason of governmental interference is unavailable because "the fault of the party owing performance . . . contribute(d) to the order." *Lowenschuss v. Kane*, 520 F.2d 255, 265 (2d Cir. 1975).

The doctrine of impossibility of performance by reason of governmental interference or judicial order "is not applied where the fault of the party owing performance under the contract contributed to the order." *Seedman v. Friedman*, 132 F.2d 290, 296 (2d Cir. 1942). And "(t)he party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract." *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir. 1975), and cases there cited. In this case, as the above findings sufficiently show, the bankrupt committed an act which contributed to the court order in that, as the United States District Court for the Southern District of New York found, a misleading statement was made to a customer. That this act must be regarded as one contributing to the issuance of the judicial order cannot be doubted under the governing legal provisions.[12] As this court has observed on prior occasion, the fact that this act alone was found by the district court in New York not to be sufficient to

warrant a permanent injunction does not eliminate its character as a sufficient contributing act to the preliminary injunction.[13]

Also, on the basis of the foregoing facts, it is clear that the bankrupt, through its principal, Mr. Miller, expressly consented to the issuance of the judicial order. There is no dissent from the proposition that consent to the judicial order eliminates the possibility of the consenting party's then claiming the defense of impossibility.[14] The respondent, however, contends that the consent which was given was not a voluntary consent to the issuance of the order; that it was "coerced" by a combination of the pressure applied to Eldon R. Miller by the counsel whom he had retained to represent Financial Corporation and himself with the Securities and Exchange Commission and by the economic pressure which was allegedly brought to bear by reason of the rumors which spread through the market environment in June and July of 1975. A complete hearing, as noted above, has been conducted on this factual issue and has resulted in the foregoing findings of the material facts. Those facts certainly do not demonstrate any coercion by counsel to the extent that the will of the president of Financial Corporation was overborne.[15] Al-

---

12. In previously discussing the findings made in this regard by the United States District Court for the Southern District of New York, this court stated that a showing of the misleading statement to Levin "would appear to be a sufficient basis for the preliminary injunction which was issued, even apart from the consent of the bankrupt and Mr. Miller. Under the provisions of section 77t, Title 15, United States Code, 'the SEC, in order to make a "proper showing" (for the issuance of a preliminary injunction), need not prove that irreparable injury will result unless an injunction is granted.' *SEC v. Scott, Gorman Municipals, Inc.*, 407 F.Supp. 1383, 1387 (S.D.N.Y.1975). See *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 806 (2d Cir. 1975), to the following effect: 'The "critical question" in issuing a . . . (preliminary) injunction is whether "there is a reasonable likelihood that the wrong will be repeated . . . . Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations.' And further, once a prima facie case of past violation and a reasonable

likelihood of recurrence is made, 'the burden of showing that there is no reasonable expectation that illegal activities will be repeated shifts to defendants." *SEC v. Scott, Gorman Municipals, Inc., supra*, at 1387." See order of April 8, 1981, in A. G. Becker & Co., Inc., claimant, v. Charles Walters, Jr., and Eldon R. Miller, respondents, directing the respondents further to show cause in writing why the claimant's claim should not be allowed in the sum of $313,-327.47.

13. See note 12, *supra*.

14. See, e.g., *Peckham v. Industrial Security Co.*, 31 Del. 200, 113 A. 799, 802 (1921), to the effect that "(a) party will not be permitted to escape liability under his contract by securing or consenting to an injunction."

15. Although some contentions are made by Mr. Miller in his testimony to the effect that he believed that his business would be shut down and that he would possibly suffer criminal prosecution if he did not affix his signature to

though counsel consistently advised him to execute the consent to the preliminary injunction and receivership, there has never been any statement or contention that they in any manner forced him to do so or sought to force him to do so. In fact, according to his own testimony, the only leverage—if it could be called that—which was applied was the general advice that, if consent was not given, the Securities and Exchange Commission would win the contest for the preliminary injunction and receivership on its merits. Mr. Miller testified that, with opportunity to do so, he did not ask counsel what facts or considerations underlay this advice. And, in fact, counsel and the Securities and Exchange Commission, according to Mr. Miller's own testimony, gave him sufficient opportunity to consider the matter for himself prior to his signing the consent form, when he was left alone in a room for a matter of hours prior to applying his signature, to "commiserate with himself" and fully consider the pros and cons of executing the agreement. This he says he did and that he finally signed the consent agreement because he thought it would be best for Financial Corporation and because he was convinced, from facts and impressions which he had gained from others on his own initiative, that the Commission would win any court case regardless of its merits.[16] There is no suggestion in the

evidence that any threat or promise was made to Mr. Miller to get him to sign the consent form, directly or indirectly, and Mr. Miller in fact affixed his signature to a form so stating.

Nor is there any evidence to support Mr. Miller's suspicion that, in advising him to sign the consent form, the law firm of Willkie, Farr and Gallagher were merely representing their own interests or those of the Securities and Exchange Commission or in any manner "sold out" their client. Because of unsupported intimations of this contention in Mr. Miller's testimony of September 3, 1981, the court granted a post-hearing discovery period to permit discovery on this issue. But, as noted above, the discovery period passed without any such discovery being taken.[17]

Nor is the doctrine of "economic duress" applicable against the claimants in the case at bar, for there is no evidence that any of the claimants were responsible for the rumors which Mr. Miller claims to have brought the downfall of Financial Corporation or, in reality, that the rumors made it impossible for Financial Corporation to do business in the respects which are relevant in this case.[18]

Further, in failing to respond to the claimants' requests for admissions on this issue, the respondent has admitted that El-

the consent form, inquiry as to any facts or any promises or threats on which he based these beliefs revealed nothing to reasonably support them. See tr. 52–68 of the hearing of September 3, 1981.

16. With respect to his contentions that he was "coerced" to sign the consent form, Mr. Miller repeatedly states that he felt that the SEC would win the case anyway; that, if he didn't sign the form, his business would be shut down and that he might be subjected to criminal penalties. Cf. note 15, *supra*. But no specific statements are evidenced from which it might be inferred that any threat or promise was made. Mr. Miller repeatedly states that it was the "actions" from which he drew these inferences; that, apparently, the "actions" of his lawyers and their obliquely mentioning the possibilities of keeping the proceedings "civil" and of controlling the identity of the receiver were what led to these conclusions on his part. But nothing is described in the evidence in the

way of "actions" which could support a finding that Mr. Miller's will was overborne.

17. See note 2, *supra*.

18. Further, the doctrine of "business compulsion" or "economic duress" is ordinarily applicable against one who seeks to obtain an "undue advantage" or to "do an unlawful injury." *Fizzell v. Meeker*, 339 F.Supp. 624, 628 (W.D. Mo.1970). When there was contribution to the circumstances which warranted the entry of the preliminary injunction in the acts of the bankrupt corporation, i.e., the misleading statement to Levin, the injunction cannot be regarded as "undue" or "unlawful." Further, as was evidenced in the hearing of September 3, 1981, Mr. Miller appears to have admitted in his testimony in the first meeting of creditors in this case that Financial Corporation was insolvent. If insolvent at the time of the preliminary injunction, that would be another contributing act.

don Miller's actions in executing the consent form were wholly voluntary.[19]

For the foregoing reasons, it can only be concluded by the court that the consent given by Mr. Miller to the entry of the order of preliminary injunction and appointing the receiver was wholly voluntary. But, even if the consent was not voluntary, the doctrine of impossibility of performance by reason of judicial order is not available when the party asserting it has committed any act which has in any way contributed to the issuance of the order and, in this case, the misleading statement found to have been made was such an act. And, further, even if it could be found that there was no consent or contribution to the judicial order, it must be held that that order did not prohibit or prevent the performances on the contracts here in question. It was the filing of the bankruptcy petition which did that, unless the bankrupt was already incapable of performing and, if so, then that incapacity must be held to have contributed to the judicial order.

Finally, it must be mentioned that the respondent claims that the financial expense which would have had to be undertaken to defend the preliminary injunction suit puts the matter within the ambit of "impossibility of performance." See *Lowenschuss v. Kane, supra,* at 265, which is cited as authority for this proposition, to the following effect:

"(it is argued that) *affirmance of the preliminary injunction* made performance of the offer impossible as a practical matter. The district court accepted this argument, finding that the impossibility attributable to the injunction was not caused by G & W.

"We agree that the preliminary injunction affirmed by this court probably rendered performance ... impossible for all practical purposes. Such an injunction is not in a formal sense final. However, in view of the large amount of time and

money usually required to attack it and the consequent tie-up of ... capital, such an attack generally may be viewed as an impractical venture. Thus, we are prepared for present purposes to hold that these circumstances give rise to 'impossibility' as that term is defined in the Restatement of Contracts section 454 (1932), which includes 'impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.' " (Emphasis added.)

In the case at bar, however, it was the preliminary injunction which was consented to and therefore this was not a case like *Lowenschuss v. Kane, supra,* in which the expense of attacking an order already made on the basis of evidence (and affirmed by the court of appeals) was coupled with the likelihood of winning being lessened precisely because of the existence of the prior order. If, in a case such as that now before the court, it was to be held that the great expense of defending the initial request for a preliminary injunction gave rise automatically to the "impossibility" doctrine, then that doctrine could be invoked by committing an act which contributes to the issuance of the judicial order and then consenting to its entry or permitting its entry by default. It is axiomatic that the "impossibility" doctrine demands much more of the party invoking it.

It is therefore, for the foregoing reasons,

ORDERED that the defense interposed by the respondent to allowance of the claims of the claimants of impossibility of performance by reason of governmental interference by means of judicial orders be, and it is hereby, overruled. Orders will shortly be entered (1) ruling on the motion for sanctions which was previously filed with respect to the former respondent Eldon R. Miller; (2) ruling on the application of lead counsel for the claimants for an award of their attorney's fees and on the manner in which such fees are to be paid;

---

**19.** The claimants demonstrated at the trial of this case, and the files and records in this case, otherwise conclusively show that a request for admission was addressed to the respondent on this question and that the respondent failed to respond. The request for admission to this effect must therefore be deemed admitted.

and (3) ruling on the allowance or disallowance of the individual claims of these claimants and the magnitude, if any, in which the claims are to be allowed. Consequently, this order should be regarded as being incorporated by reference in the subsequent orders, and each of them, ruling on the claims of the individual claimants, and therefore appealable within 10 days from and after the entry of those orders. The same principles and therefore the same time limitations should be regarded as applicable as to any motion for reconsideration or to alter or amend or vacate this order.