# CHARLESTON.

## McCORMICK v. JORDON.

Submitted June 5, 1908. Decided February 2, 1909.

1. CONTRACTS—*Construction—Guaranty.*

   A statement made in the formation of a contract that is mere opinion or estimate, or about a matter which, from its nature,

is not susceptible of accurate knowledge, is not a guaranty or fraud affecting the contract.  (p. 89.)

2.  SAME—*Action—Pleading.*

Where a contract calls for the completion of a work as a condition precedent to payment, a bill or declaration seeking payment must aver completion of the work or state sufficient ex-cuse therefor, and must state clearly the facts and circumstances of such excuse.  (p. 90.)

3.  SAME—*Excuse for Non-Payment.*

In an action upon a contract containing a condition precedent, where the declaration or bill gives one excuse for non-compliance with such condition, another excuse not pleaded cannot be relied on or proven.  (p. 91.)

4.  SAME—*Failure to Perform—Excuse.*

If a party by contract charge himself with an obligation possible to be performed, he must make it good, unless performance is rendered impossible by the act of God, the law or the other party.  Unforeseen difficulties, however great, will not excuse him.  (p. 90.)

Appeal from Circuit Court, Wood County.

Bill by J. M. McCormick against J. L. Jordon and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

V. B. ARCHER and WM. BEARD, for appellants.

L. N. TAVENNER, for appellee.

BRANNON, JUDGE:

The Jordon Oil & Gas Company owned an oil well which had been partly drilled.  J. M. McCormick, as party of the ·first part, and the Jordon Oil & Gas Company, parties of the second part, made a written contract by which McCormick agreed "to drill or attempt to drill" an oil well for the Jordon Company "from their (its) present depth on through what is known as the Injun sand and case the same through said Injun sand, for which second parties are to pay first party Fifteen Dollars per day, single tower, for his crew and tools, and to furnish all additional help necessary for putting in the casing, and to be responsible to the first party for any loss of tools and time spent for fishing for same while working at said well below the shot holes in said well before the casing of said well.  If there is no oil found in paying quantities before the well is drilled

through the Injun and Squaw sands, and the well cased, then the first party agrees to drill the well on down to and through the Berea sand at his own risk as to finishing said well, ·for which the said second parties are to pay to the said first party One Dollar per foot for the drilling below said casing. * * * * * Payment to be made to first party for the 'days work' 10 days after' work had commenced by contract, or a well gotten, and for the 'contract work' 10 days after the completion of said well." McCormick drilled the well down through the Injun sand and cased it to the bottom of that sand without finding oil in it and then proceeded to bore on down to a certain depth when he abandoned the work. He did not bore down to the Berea sand as demanded by the contract. Much evidence shows this. Downing, a witness for McCormick, says they were in no sand when they quit. The Jordon Company refused to pay him for the work alleging that he had failed to complete the work, and had abandoned it before reaching the Berea sand. McCormick instituted in the circuit court of Wood county an attachment in equity suit against the defendants as non-residents. The court decreed in McCormick's favor $1,704.50 and the Jordon Company has appealed.

McCormick under that provision of the contract providing for drilling down to and through the Injun sand, called in the contract "days work," drilled 80½ towers. He demands for 30½ towers of that work fifteen dollars per day and for 50 towers twenty-five dollars per day. The contract calls for fifteen dollars per day for boring to the bottom of the Injun sand; but Mc-Cormick makes an increase charge of ten dollars per day for part of that drilling on the ground that prior to and at the time of the making of the contract Jordon, one of the partners acting for the firm, said that it would not require more than seventy feet of drilling from the bottom of the well as it had before been drilled to and through the Injun sand, and that upon faith of that representation or statement he, McCormick, signed the contract; and that instead of the drilling required to go through the Injun sand being only seventy feet it was much more. Then, our first question is: Is McCormick entitled to twenty-five dollars per tower for this excess of drilling over seventy feet to get through the Injun sand? We answer that he is not. And why? First, That the written contract

contained no such provision. It is well settled that you cannot alter or deny a written contract by oral evidence. It is well settled that conversation, negotiation, interlocution, between the parties before and at the time of the making of a written contract cannot be used to qualify or contradict it. *Crislip* v. *Cain,* 19 W. Va. 438; *Long* v. *Perine,* 41 *Id.* 314. Unless there be fraud, that is the rule. If we could say that the statement by Jordon that it would require drilling for only seventy feet to go through the Injun sand was a false representation or guaranty, there might be force in McCormick's pretention; but that was only an opinion expressed by Jordon, if he made it, which he denies. Did not McCormick have the same basis for knowledge as to this that Jordon had? Could Jordon pierce the ground below the great depth of 1,701 feet the then depth of the well, and see how far it was to the Injun sand? We know that he could not, except by mere estimate or guess from other wells in that section. And the depth of the sand varied there according to the evidence. In fact, by the evidence, McCormick was better able to guess how far it was to the Injun sand than was Jordon, because McCormick had been drilling wells for nearly ten years, and was very much more experienced than Jordon, who was comparatively without experience, especially in *drilling* wells. The very nature of the case tells us that Jordon was only making a guess or expressing an opinion, and tells us besides that McCormick had no right to rely upon that guess as an assurance or serious representation. "Upon the authorities it may be laid down as a general rule that an expression of opinion or belief, if it is nothing more than this, and if so intended and understood, is not a representation of fact, and, though false, does not amount to fraud. A person ordinarily has no right to rely upon such a statement, and if he does so he cannot treat it as fraud, either for the purpose of maintaining an action of deceit, or for the purpose of rescinding a contract at law or in equity." 14 Am. & Eng. Ency. L. 34. "To furnish grounds for an action of deceit the representation must be of a matter susceptible of approximately accurate knowledge and must be in form and substance an assertion importing knowledge on the part of the speaker. A statement which by reason of its form or subject-matter amounts merely to an expression of opinion is not actionable, for it is one upon which reliance cannot safely

be placed." 20 Cyc. 17. The same rule is spoken in *Wamsley* v. *Currence*, 25 W. Va. 543, and by Judge SANDERS in *Cleavenger* v. *Stern*, 59 *Id.* on p. 662. So in 6 Encyclopedic Digest 454,

Next, the drilling from the Injun sand on down to the point where McCormick abandoned the work. That comes under that clause of the contract calling for the continuation of the work from the Injun to the Berea sand. The letter of the contract demands that McCormick drill through the Berea sand "at his own risk as to finishing said well." And the contract provides that for such continuation below the Injun sand Mc-Cormick should be paid "10 days after the completion of the said well." The well would not be completed short of through the Berea sand. It is plain that the contract here tells of a condition precedent. No pay for such "contract work" was demandable until such completion. We find Judge Lee laying down the law thus in *B. & O. Co.* v. *McCullough & Co.*, 12 Grat. 595: "Stipulations in a covenant or other contract are to be regarded as dependent or independent, according to the intention and meaning of the parties, and the good sense of the case. *Hotham* v. *East India Company*, 1 T. R. 638; *Porter* v. *Sheppard*, 6 T. R. 665; *Campbell* v. *Jones*, 6 T. R. 570; *Morton* v. *Lamb*, 7 T. R. 125. And where an act is to be done by one party by way of condition precedent to his right to claim performance on the part of the other, he cannot claim such performance without averring the doing of such act or his readiness and offer to do it. *Thorpe* v. *Thorpe*, Lord Raym. 662; *Collins* v. *Gibbs*, 2 Burr. R. 899; *Brockenborough* v. *Ward's Adm'r.*, 4 Rand. 352." No pay can be demanded for work under a clause demanding its completion as a precedent condition before completion. *Brockenborough* v. *Ward*, 4 Rand. 352. Where a suit in such a case is brought, if the declaration is based on the contract by special count it must aver strict performance, though where the condition has been complied with and the work done recovery may be had on the common counts. "It is a well settled rule of law, that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law or the other party. Unforeseen difficulties, however great, will not excuse him. The application of this principle to the class of cases to which the

one under consideration belongs is equally well settled.  If a
tenant agree to repair, and the tenement be burned down, he
is bound to rebuild.  A company agreed to build a bridge in a
substantial manner, and to keep it in repair for a certain time.
A flood carried it away.  It was held that the ·company was
bound to rebuild.  A person contracted to build a house upon
the land of another.  Before it was completed it was destroyed
by fire.  It was held that he was not thereby excused from the
performance of his contract.  A party contracted to erect and
complete a building on a certain lot.  By reason of a latent
defect in soil the building fell down before it was completed.
It was held (*School Trustees* v. *Bennett,* Sec., a case in New
Jersey, cited by counsel), that the loss must be borne by the
contractor.  The analogies between the case just cited and the
one under consideration are very striking.  There is scarcely
a remark in the judgment of the court in that case that does
not apply here.  Under such circumstances equity cannot inter-
pose.

The prinicple which controlled the decision of the cases re-
ferred to rests upon a solid foundation of reason and justice.
It regards the sanctity of contracts.  It requires parties to do
what they have agreed·to do.  If unexpected impediments lie
in the way, and a loss must ensue, it leaves the loss where the
contract places it.  If the parties have made no provision for a
dispensation, the rule of law gives none.  It does not allow a
contract fairly made to be annulled, and it does not permit to
be interpolated what the parties themselves have not stipulated."
*Dermott* v. *Jones,* 2 Wall. p. 7.  But where there has been no
completion the declaration must give an excuse for non-compli-
ance with the condition.  "Where a condition precedent is an-
nexed to a contract upon which it is to take effect, the contract
will not take effect until such condition is performed."  *Wend-
linger* v. *Smith,* 75 Va. 309, 40 Amer. R. 727.  But the bill
proposes to make an excuse for non-performance.  "Where the
plaintiff intends to rely on an excuse for not performing what-
ever it may be, the particular facts and circumstances consti-
tuting such excuse should be averred."  9 Cyc. 723.  *Wheeling
Mold·&c. Co.* v. *Wheeling &c. Co.,* 58 W. Va. 62, so holds.
The bill in this case does not aver performance, explicitly, but
alleges that the well was·drilled down to the Berea sand "or

where it should have been found," and if it had alleged it it would not be true. But it avers by way of excuse for not drilling down to and through the Berea sand that "the defendants of their own accord shut down the said well and declared the same deep enough, and stopped the plaintiff's workmen in the middle of a tower and sent the plaintiff's workmen home." The evidence does not justify this allegation. The facts are that at a certain point in the well the drillers told Jordon that the well was dry, that it had the smell of a dry well, and that it was of no use to drill farther. Under this influence, coming from McCormick's drillers, men of experience, operating upon an inexperienced man with great effect, Jordon did say that it was useless to go farther now and that he would take samples of sand to his partners and an experienced man, Galliher, and consult with them as to going farther, and did ask one of the drillers to come back when he returned from home and help draw the casing. One of the men did leave the premises, but others were there and while they were still there, unexpectedly Galliher came to the well and he was told by Brown, a driller, that it was a dry well, and that oil could not be produced from it. Brown told Galliher however, to examine the samples of sand which Jordon had preserved. At once Galliher did so and promptly declared that at the point reached there was no sand, that the sample there found was not sand and said that the well must be drilled deeper and told them not to plug the well, and that if they did not drill on down Jordon would not pay McCormick anything. McCormick's witnesses say that Galliher said this; and they say that while talking about suspending they saw Galliher coming and Jordon stated that he would go by what Galliher would say. Jordon was still standing there; so was Brown and perhaps others. McCormick was not there. This was on Saturday. Jordon at once went to the telephone and called McCormick a few miles off and told him to send out Downing, the driller who had gone home, and that the well was not deep enough, and must be bored deeper. McCormick replied that they were not far enough down to reach the Berea sand. So Jordon swears, and McCormick does not deny this. At that time operations had not ceased. The engine was still going. Jordon had not relieved McCormick from his contract, had not said to McCormick that it was useless to go

farther.  All that he had said was that for the present they
would suspend until he should go home to consult Galliher and
his partners; but he did not go home as that was rendered un-
necessary by the coming of Galliher, and Jordon told the work-
men and McCormick that the drilling must go on.  Roth, an
employee and witness for McCormick, who was present at the
time it is said Jordon talked of suspending, says that he talked
something of suspending, but he is emphatic to say that Jordon
did not tell them to stop.  He says also that McCormick per-
sonally directed the work after Jordon made this alleged suspen-
sion.  McCormick admits that he agreed with Jordon to go on
after this alleged stopping.  All that Jordon had said, and that
was induced by the opinion of McCormick's employees, was
that he thought it advisable to suspend until he could go home
and consult with his partners.  They were mere hands of Mc-
Cormick.  He never said a word to McCormick of abandoning
the well or even of suspending work.  On the contrary, he told
McCormick that very day that the well was not deep enough,
and to send Downing out to go on with the drilling.  There was
no suspension even; but suppose there had been.  It would have
been authorized by McCormick.  I say this because the Jordon
Company had prepared a draft of a contract for this work and
sent it to McCormick for signature, but McCormick declined
to sign it, and made a duplicate draft of his own and by letter
transmitted it to the Jordon Company for their signature, and
this is the contract above referred to under which the work was
done, and that letter from McCormick accompanying the con-
tract said that he, McCormick, was "perfectly willing to shut
down a day or a part any time you want to test the casing
*or whatever you want* and for any whole day we are not working
there will be no charge made."  This claim of the bill that the
Jordon Company shut down the well and stopped the work is
repelled and overthrown by McCormick's own action.  If there
had been a shut down he waived it.  When on that Saturday
Jordon telephoned him that the well was not deep enough and
to send Downing to go on with the work McCormick replied
that the well was not deep enough, and he did send Downing
to go on with the work.  Roth, a witness for McCormick, one
of the workmen at the well, says he heard Jordon tell McCormick
not to quit.  McCormick several times on the stand says Jordon

demanded that he go on with the work. When Downing came to the well Saturday or Monday while yet Galliher was there it was found that the cable was defective, and that it would be dangerous to use it in the well. Jordon demanded of McCormick that he send a new cable. He refused to get a new cable, but said he would get a second hand one, and he did get it, and sent it to the well. When he did this he had information of what had occurred as to suspending, must have had from Downing. He had already been told undeniably by Jordon on that Saturday that the well was not deep enough and to send Downing to proceed with the work, and by the demand for a new cable that Jordon had not abandoned the enterprise. Not only this. The boring was resumed by McCormick with this second hand cable, his son being on the ground, and owing to its weakness and deficiency, as all, including McCormick, say, the tools were loosened from it and dropped in the well. Then McCormick sent a new cable and fished for days and days for the tools in a fruitless effort to get them out of the well, and then tried to drill past the tools, though he says as a witness that he had no idea he could drill past them, and not succeeding, without notice to Jordon, he wholly and totally abandoned the work, and told Jordon later that he would not go on. If there had been an abandonment of the work by the Jordon Company why did McCormick go on for days in the prosecution of the work? In an interview with Jordon after he abandoned the work he was told by Jordon that the well was not completed and he replied "That is between you and me." This he does not deny. What was the import of that language? As a witness he stated that when he quit the work he set up and acted on his own judgment. Thus he disregarded the will of the owners of the well. He says he did not consider it profitable to go on, it was money thrown away. He admits that he told Jordon that he would not go on with the work. He states that the reason he quit was because he could not get the tools out of the well. This shows that he did not claim that the well had been completed. The evidence plainly shows that McCormick wanted to retreat from his contract. The Jordon Company did not stop the work or even suspend it. Jordon thought of suspending it for a short time to see what Galliher and his partners should say when he should go home to consult them; but he never carried

that thought into execution, and at once renounced it at the well when Galliher came and thus dispensed with Jordon's going home, and the determination to go on with the work was then and there made and declared. Thus such excuse for non-performance is unsustained. The well was not "finished," in the word of the contract.

The above excuse failing from want of evidence it seems that McCormick seeks to give another excuse by his evidence. That execuse is that there was no Berea sand where it should have been found. The evidence clearly shows that this was not so; for after McCormick abandoned the work the Jordon Company bought tools, hired hands, fished McCormick's tools from the well, bored the well deeper and found the Berea sand. But this excuse of the non-existence of the Berea sand, if it did not exist, cannot be heard in this case, because it is not pleaded in the bill as an excuse for non-performance. I have already cited law that an excuse with the particular facts and circumstances must be averred in cases of condition precedent. The bill does not specifically aver that the Berea sand was non-existent. It says that the well went down "to the Berea sand, or where the Berea sand should have been found." There is no averment of the non-existence of the sand. Consequently all the evidence going to prove that is inadmissible, because there is no allegation in the bill to warrant its admission. The allegations and proof in suits in equity must set forth and support the same cause of action. A party cannot state one case in his pleading and make a different one by his proofs. *Pigg* v. *Corder,* 12 Leigh 69; *Floyd* v. *Jones,* 19 W. Va. 359.

The Jordon Company claims that it is entitled to damages against McCormick consequent upon his failure to complete the well, and they file a specification of items of expense incurred drilling the well from the depth of 1,701 feet, where McCormick began, to the point where he quit. They ask pay for J. L. Jordon's time spent at the well during McCormick's operation one hundred and forty days at two dollars per day. We refuse to allow this. Jordon was not an employee of McCormick. He was at the well in the interest of his firm. We reject the claim for his board for that time. We reject his claim for five men setting casing. The contract required him to do this. This casing was in that part of the work above the bottom of the

Injun sand. We reject the claim for car fare going to meet the company and for horse and buggy and driver to Eaton. We reject other items in that Exhibit No. 1, J. L. J. We do not allow anything for the cost of drilling down to the point where McCormick's work commenced, if there is any claim made for it. The answer sets that up, but we do not allow it. The well was not ruined. The Jordon Company completed it, and got the benefit of their prior work, if a paying well, and if not, that charge is not allowable. We allow the Jordon Company forty dollars for fishing out the tools left in the well by McCormick, dropped into it by reason of defect of McCormick's cable. We decline to allow the items claimed in the answer for the use of boiler, engine and belt and bull rope, because the contract required the Jordon Company to furnish them. We allow them for a reel destroyed and its drayage twenty-one dollars and sixty cents. We allow McCormick for drilling through the Injun sand 80½ towers or days at fifteen dollars each and fourteen dollars for expense of fishing out tools during the "days work," and thirty-two dollars for hauling tools to the well.

We therefore reverse the decree of the circuit court so far as it decrees to McCormick the sum of $1,704.50, and in place of that sum we decree to McCormick $1,273.22, that being the sum allowed and interest from 1st August, 1905, to 27th September, 1906, the date of the decree of the circuit court, with interest on said sum of $1,273.22 from 27th September, 1906.

The Jordon Company filed a claim for expense of finishing the well from the point where McCormick abandoned it. We do not pass upon that demand. It is not claimed in the answer. To say nothing further about it that is reason for not passing on it. That is a matter not affected by the decree of this Court. The answer does not allege completion by the Oil and Gas Company, or the cost.

*Reversed.*