606 S.E.2d 222

**William A. WADDY, IV, Plaintiff Below, Appellant,**

v.

**Denver L. RIGGLEMAN, III, and Christine M. Riggleman, Husband and Wife, and Chase Manhattan Mortgage Corporation, and C. Fred Ours and Carol A. Ours, Defendants Below, Appellees.**

No. 31707.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 8, 2004.

Decided Oct. 22, 2004.

252

Clyde M. See, Jr., See & See, Moorefield, for the Appellant.

J. David Judy, III, Judy & Judy, Moorefield, for the Appellees.

DAVIS, Justice:

In this case Mr. William W. Waddy, IV, (hereinafter referred to as "Mr. Waddy"), filed a law suit seeking specific performance of a contract for the sale of land. He now appeals an order of the Circuit Court of Grant County granting judgment as a matter of law in favor of the defendants, Denver L. Riggleman, III, and his wife Christine Riggleman (hereinafter referred to as "the Rigglemans"). The circuit court's award of judgment as a matter of law was based, in part, upon that court's conclusion that the Riggleman's performance of their contractual obligation should be excused as impossible because they were unable to secure certain releases to enable them to transfer clear title to Mr. Waddy as required under the relevant

contract. Additionally, the circuit court concluded that time was of the essence of the contract. We find that the circuit court erred in granting judgment as a matter of law. We herein adopt the doctrine of impracticability, and further conclude that, based upon the facts established in the record at the close of Mr. Waddy's case, the Rigglemans had not met their burden of establishing that their performance had been rendered impracticable. We further conclude that the circuit court erred in finding that time was of the essence of the contract, and in dismissing Mr. Waddy's claims against C. Fred Ours and Carol A. Ours. Consequently, we reverse this case and remand for further proceedings not inconsistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On July 5, 2002, Mr. Waddy, appellant herein and plaintiff below, entered into a contract wherein he agreed to buy a certain thirty acre tract of land from the Rigglemans, appellees herein and defendants below. It is established in the record that the Rigglemans had encountered financial difficulties and desired to sell the property in a timely fashion in order to alleviate their debt burden. Pursuant to the contract, Mr. Waddy was to pay $750 per acre for the tract of land, for a total purchase price of $22,500. The closing was to be held on or before September 5, 2002. In addition, the contract expressly declared, inter alia, that

3. Sellers agree to convey the subject real estate in fee simple, with covenants of general warranty of title, *free and clear of all liens and encumbrances.* Buyers (sic) shall have the opportunity to have a title examination done on the subject property prior to closing, and *any defects in title shall be cured by the Sellers prior to closing.*

4. Sellers agree to pay for any and all necessary costs of surveying, the preparation of the deed of conveyance, the revenue stamps, the attorney fees for any necessary releases, and all costs associated with eliminating any defects in title. The balance of the closing expenses shall be the responsibility of the Buyer.

(Emphasis added). Mr. Waddy paid to the Rigglemans $2,000 at the time the foregoing agreement was executed.

The contract was prepared by Mr. John G. Ours, a lawyer in Petersburg, West Virginia (hereinafter referred to as "Attorney Ours"), who Mr. Waddy had hired to represent him in connection with this purchase of land from the Rigglemans. After Attorney Ours had been retained by Mr. Waddy, Mr. Riggleman asked Attorney Ours to also represent the Rigglemans in this regard, including taking steps necessary to obtain releases of two deeds of trust under which the land was encumbered. Based upon representations made by Mr. Riggleman, Attorney Ours believed he could easily obtain releases or partial releases to clear title to the thirty acre tract of land. As a result, Attorney Ours did not immediately endeavor to obtain the releases.

Subsequently, Mr. Riggleman expressed to Mr. Waddy that, due to his financial difficulties, he desired to sell an additional ten acres of land. Mr. Waddy agreed to add ten acres to the tract of land he was purchasing, and the two gentlemen entered a second agreement. The terms of the second contract, which was executed on July 29, 2002, were nearly identical to the first. The new contract specified that the real estate to be sold included the thirty acres that was the subject of the July 5 agreement, along with an additional ten acres. The agreed upon price-per-acre remained the same, so that the total purchase price of the tract was increased to $30,000. The document further acknowledged that Mr. Waddy had paid to Mr. Riggleman a total of $4,000 toward the total costs of the transaction.[1] As with the first agreement, the closing was to be held on or before September 5, 2002. Finally, Mr.

---

1. The $4,000 included $2,000 paid by Mr. Waddy to Mr. Riggleman at the execution of the July 5 agreement, and another $2,000 paid at the execution of the July 29 agreement.

Waddy agreed to pay one-half of the cost of surveying the forty acres.[2]

On September 6, 2002, the parties entered a third agreement. This agreement added an additional eight acres to the size of the tract of land being sold, and extended the closing date to be held on or before September 20, 2002. The terms of the agreement were changed only slightly from the July 29 agreement, and none of the changes are pertinent to the issues herein addressed.

Thereafter, Mr. Riggleman requested that the closing be held on September 16, 2002. Mr. Waddy explained that the funds he planned to use for the purchase would not be available until September 17, 2002. Mr. Riggleman then learned that Attorney Ours had not yet obtained the releases that were necessary to clear the title to the land. Based upon his earlier conversation with Mr. Riggleman, Attorney Ours incorrectly believed that obtaining the releases would be uncomplicated and quick to achieve.[3] On the contrary, there were specific requirements that had to be fulfilled before any releases would be issued by the lien holders. Attorney Ours had not secured the releases by the September 20, 2002, closing date.

On or about September 27, 2002, after the contractually set closing date had passed, Mr. Riggleman notified Attorney Ours by letter that he would not proceed with the sale of the land to Mr. Waddy.[4] On October 1, 2002, Attorney Ours advised Mr. Waddy and the Rigglemans that he could no longer represent any of them.

On November 14, 2002, Mr. Waddy instituted the civil suit underlying this appeal. Mr. Waddy sought specific performance of the contract dated September 6, 2002, for the sale of the forty-eight acres. He also sought other damages and named as party defendants the lien holders of record, who were Chase Manhattan Mortgage Corporation and Northwest Financial Group (Wells Fargo Mortgages, Inc.).

Subsequent to the filing of Mr. Waddy's complaint, the Rigglemans conveyed a tract of real estate containing ninety-six acres to C. Fred Ours and Carol A. Ours. This conveyance purported to sever or eliminate, by failure to reserve, a right of way to the forty-eight acres that is the subject of this dispute. Consequently, Mr. Waddy filed an amended complaint naming C. Fred Ours and Carol A. Ours as party defendants. The amended complaint also removed Northwest Financial Group as a party defendant.[5]

A bench trial was held. After Mr. Waddy presented the testimony of several witnesses and rested his case, the Rigglemans moved the circuit court to order a directed verdict. By order rendered July 7, 2003, the circuit court granted the motion for directed verdict in favor of the Rigglemans. The circuit court found that, because the dates set for closing were clearly important to the parties to the contract, the closing dates were "of the essence" with respect to the contract.[6] The circuit court also found that Mr. Waddy's ability to obtain a clear title to the real estate was a key element of the respective contracts. Observing that obtaining releases of the deeds of trust on the property by the time of closing was necessary in order to transfer clear title as contemplated by both parties, the circuit court further found that the transfer of the real estate was an impossibility.

The circuit court dismissed the case with prejudice and ordered the Rigglemans to refund to Mr. Waddy the $4,000 deposit

---

2. Under the July 5 contract, the Rigglemans had agreed to pay the entire cost of surveying the land.

3. Attorney Ours testified that he did not believe that Mr. Riggleman had in any way attempted to purposefully mislead him regarding the complexity of the liens on the property. Attorney Ours also conceded that he should have begun the process of obtaining the releases at an earlier point in time.

4. Mr. Riggleman apparently stated that he had obtained financial assistance from a relative and no longer needed to sell the property.

5. Apparently the lien owed to Northwest Financial Group had been paid and it no longer held a lien on the property.

6. The court then observed that Attorney Ours could have been more diligent in his representation of the issues of the contracts between Mr. Waddy and the Rigglemans.

made by him and $1,200 Mr. Waddy contributed to the cost of surveying the property. The circuit court also dismissed with prejudice Mr. Waddy's claims against the defendants C. Fred Ours and Carol A. Ours. It is from this order that Mr. Waddy now appeals.

## II.

### STANDARD OF REVIEW

In this case, we are asked to review an order in which the circuit court granted to the Riggleman's a directed verdict. Mr. Waddy correctly notes that the reference to a directed verdict is incorrect. The proper procedural designation for the Riggleman's motion is one for judgment as a matter of law. Because " ' "[w]e are not bound by the label[s] employed below, and will treat [matters] made pursuant to" the most appropriate rule.' " *Shaffer v. Charleston Area Med. Ctr.*, 199 W.Va. 428, 433, 485 S.E.2d 12, 17 (1997) (quoting *Kopelman & Assoc., L.C. v. Collins*, 196 W.Va. 489, 494 n. 6, 473 S.E.2d 910, 915 n. 6 (1996) (additional citation omitted)). Therefore, we will treat the order before us for review as one granting a motion for judgment as a matter of law.

■■■ The proceeding below was a bench trial, consequently, the judgment as a matter of law was granted pursuant to Rule 52 of the West Virginia Rules of Civil Procedure.[7] We have not expressly set out our standard for reviewing a ruling on a judgment as a matter of law under Rule 52. Explaining our review of a ruling granting judgment as a matter of law under Rule 50 of the West Virginia Rules of Civil Procedure, we have held

"The appellate standard of review for the granting of a motion for a [judgment as a matter of law] pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this [C]ourt, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a [judgment as a matter of law] when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed." Syllabus Point 3, *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996).

Syl. pt. 5, *Smith v. First Cmty. Bancshares, Inc.*, 212 W.Va. 809, 575 S.E.2d 419 (2002). We have maintained the same standard where a Rule 50 motion for judgment as a matter of law has been denied.

"We review *de novo* . . . the denial of the [judgment as a matter of law]" made pursuant to Rule 50(a) of the West Virginia Rules of Civil Procedure. *Adkins v. Chevron, USA, Inc.*, 199 W.Va. 518, 522, 485 S.E.2d 687, 691 (1997). This Court has said that a judgment as a matter of law should be granted at the close of the evidence when, after considering the evidence in the light most favorable to the nonmovant, only one reasonable verdict is possible. *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 481 n. 6, 457 S.E.2d 152, 158 n. 6 (1995). In addition, "[u]pon a motion for a [judgment as a matter of law], all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed." Syllabus Point 5, *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973).

*Yates v. University of West Virginia Bd. of Trs.*, 209 W.Va. 487, 493, 549 S.E.2d 681, 687 (2001). *See also Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 100 n. 2, 468 S.E.2d 712, 715 n. 2 (1996) ("The circuit court's denial of the motion for judgment as a matter of law poses a question of law, and, therefore, this Court's review of such a ruling is plenary. In addressing such issues on appeal, we must approach the evi-

---

**7.** Rule 52(c) of the West Virginia Rules of Civil Procedure states:

*Judgment of partial findings.*—If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

dence from a coign of vantage identical to that employed by the trial court in the first instance. This approach dictates that we take the record in the light most flattering to the nonmoving party, without probing the veracity of the witnesses, resolving conflicts in the testimony, or assaying the weight of the evidence. We may reverse the denial of such a motion only if reasonable persons could not have reached the conclusion that the jury embraced."). *Cf Taylor v. Elkins Home Show, Inc.*, 210 W.Va. 612, 616, 558 S.E.2d 611, 615 (2001) (" 'We apply a *de novo* standard of review to the grant . . . of a . . . post-verdict motion for judgment as a matter of law. After considering the evidence in the light most favorable to the nonmovant party, we will sustain the granting or denial of a . . . post-verdict motion for judgment as a matter of law when only one reasonable conclusion as to the verdict can be reached.' ") (quoting *Gillingham v. Stephenson*, 209 W.Va. 741, 745, 551 S.E.2d 663, 667 (2001)).

In accordance with the foregoing, we now expressly hold that the appellate standard of review for a circuit court order either granting or denying a motion for judgment as a matter of law in a bench trial, made pursuant to Rule 52 of the West Virginia Rules of Civil Procedure, is de novo. On appeal, this Court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a judgment as a matter of law when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed.

Having established the proper mode for our review, we now consider the substantive issues herein raised.

## III.

### DISCUSSION

Mr. Waddy raises two primary issues which will be addressed in this opinion. First, Mr. Waddy argues that the circuit court erred in granting judgment as a matter

of law to the Rigglemans on the basis that performance of the contract had been rendered impossible. Mr. Waddy next complains that the circuit court erred in concluding that time was of the essence of the contract. We will begin our analysis of this case with an overview of the doctrine of impossibility, followed by an application of the relevant doctrine to the facts of the instant case. We will then address the court's conclusion that time was of the essence of the contract underlying this dispute. Finally, we will resolve a tangential issue raised by Mr. Waddy regarding the circuit court's dismissal, with prejudice, of Mr. Waddy's claims against the defendants C. Fred Ours and Carol A. Ours.[8]

### A. Overview of the Doctrine of Impossibility

A statement of the doctrine of impossibility was set out by this Court in 1909 as follows: "If a party by contract charge himself with an obligation possible to be performed, he must make it good, unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him." Syl. pt. 4, *McCormick v. Jordon*, 65 W.Va. 86, 63 S.E. 778 (1909). Rules such as this one announced in *McCormick* were developed in the common law to alleviate, to a limited degree, the harsh results obtained from the strict rule of absolute contractual liability by providing, under certain limited circumstances, an excuse from performance of a contract. *See McGinnis v. Cayton*, 173 W.Va. 102, 110–11 n. 11, 312 S.E.2d 765, 774 n. 11 (1984) ("[The doctrines of impossibility and frustration of purpose] originated in English common law, and are most frequently attributed to *Paradine v. Jane*, 82 Eng. Rep. 897 (K.B. 1647) and *Krell v. Henry* (1903) 2 K.B. 740 . . . .' The law slowly moved from a rule of absolute contractual liability to a 'rule of discharge.' *See* Hurst, *Freedom of Contract In An Unstable Economy: Judicial Reallocation of Contractual Risks Under UCC Section 2–615*, 54 N.C. Law Rev. 545 (1975–76)."). *See also Opera Co. of Boston*,

---

8. Mr. Waddy additionally argues that this Court should grant judgment as a matter of law in his

favor. We find this argument to be without merit.

*Inc. v. Wolf Trap Found. for Performing Arts,* 817 F.2d 1094, 1097 (1987) ("The doctrine of impossibility of performance as an excuse or defense for a breach of contract was for long smothered under a declared commitment to the principle of sanctity of contracts. . . . The growth of commercial activity in the nineteenth century, however, made this rigidity of the doctrine of impossibility both 'economically and socially unworkable,' . . . and . . . the English courts recognized these changed conditions and, relying largely on civil law precedents, relaxed the constraints on the doctrine by the principle of sanctity of contracts as followed by the English courts since *Paradine v. Jayne,* Alleyn, 27, 23d Charles II (1670)." (internal citations omitted) (footnote omitted)).

In modern times, the rule of impossibility has undergone further relaxation. As one commentator has explained:

[T]he law of impossibility has evolved through two rules. Early cases settled upon a strict rule of impossibility: parties were required, when forming their contract, to foresee, as accurately as possible, all consequences that could result from an agreement; if a contract became impossible to perform and the parties had failed to anticipate that eventuality, then the chips fell where they may, despite serious hardship to one party. Later cases moved away from this rigid viewpoint, settling on a more equitable rule of impracticability that entertained the excuse of impracticability under certain unanticipated circumstances. Substituting the term "impracticability"—instead of the historical usage of "impossibility"—better expresses the ex-

tent of the increased legal burden that is required.

30 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 77:1, at 277 (4th ed. 2004) (footnotes omitted) (hereinafter referred to as "Williston on Contracts").

The modern rule, the rule of impracticability, is identified in the Restatement (Second) of Contracts as "Discharge by Supervening Impracticability," and is described as follows:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

§ 261 (1979). It has been observed that "[m]ost of the more recent cases follow this approach." 14 James P. Nehf, Corbin on Contracts § 74.2, at 15 (Rev. ed. 2001) (hereinafter referred to as "Corbin on Contracts").[9] *See, e.g., United States v. Winstar Corp.,* 518 U.S. 839, 904, 116 S.Ct. 2432, 2469, 135 L.Ed.2d 964 (1996) (quoting Restatement (Second) of Contracts § 261 to demonstrate requirements for the common-law doctrine of impossibility); *Cazares v. Saenz,* 256 Cal. Rptr. 209, 212 & n. 7, 208 Cal.App.3d 279, 285 & n. 7 (1989) (applying section 262 of the Restatement (Second) of Contracts and acknowledging that it is a "specific type of impracticability of performance supplementing the general statement of the rule in section 261. . . ."); *O'Hara v. State,* 218 Conn. 628, 637, 590 A.2d 948, 953 (1991) (applying Restatement (Second) of Contracts § 261); *Leon County v. Gluesenkamp,* 873 So.2d 460, 463–64 (Fla.Dist.Ct.App.2004) (ap-

**9.** A companion to the rule of impracticability that is also widely recognized involves discharge by supervening frustration, and states:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1979). This section of the Restatement is substantially similar to the general rule for impracticability, although it substitutes the language "principal

purpose is substantially frustrated" for the language "performance is made impracticable" that is contained in § 261 of the Restatement. *See* 14 Corbin on Contracts § 74.2, at 15. Corbin also recognizes that

"[u]nder either doctrine, the cases turn on the degree of hardship caused by the supervening event, the foreseeability of the event, the language of the contract possibly allocating such risks, the relative fault of the parties in causing the event or failing to anticipate it, and any other circumstances indicating that one party should suffer the loss rather than the other."

*Id.* (Footnotes omitted).

plying Restatement (Second) of Contracts §§ 261 & 264); *American Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 330 (Iowa 1998) (applying Restatement (Second) of Contracts § 261); *M.J. Paquet, Inc. v. New Jersey Dep't of Transp.*, 171 N.J. 378, 794 A.2d 141 (2002) (applying doctrine of impracticability as defined in Restatement (Second) of Contracts § 261); *Luber v. Luber*, 418 Pa.Super. 542, 614 A.2d 771 (1992) (applying Restatement (Second) of Contracts § 261); *Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours and Co.*, 118 S.W.3d 60, 65 (Tex.App. 2003) (relying on decision of the Texas Supreme Court to find that "the doctrine of commercial impracticability as defined in the Restatement does exist in Texas") (citing *Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex.1992)); *Mortenson v. Scheer*, 957 P.2d 1302 (Wyo.1998) (relying on Restatement (Second) of Contracts § 261).

Following this modern trend, we now adopt the Restatement (Second) of Contracts § 261 and hold that, under the doctrine of impracticability, a party to a contract who claims that a supervening event has prevented, and thus excused, a promised performance must demonstrate each of the following: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed, either expressly or impliedly, to perform in spite of impracticability that would otherwise justify his nonperformance. *See O'Hara v. State*, 218 Conn. 628, 637, 590 A.2d 948, 953 (" 'A party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that: (1) the event made the perform-

ance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes. 2 Restatement (Second), Contracts § 261' " (additional citations omitted)). *See generally* 2 E. Allan Farnsworth, Farnsworth on Contracts § 9.6, at 543–44 (1990) ("Under the new synthesis, the party that claims that a supervening event or 'contingency' prevented performance must meet four requirements. First, the event must have made 'performance as agreed ... impracticable.' Second, the nonoccurrence of the event must have been 'a basic assumption on which the contract was made.' Third, the impracticability must have resulted without the fault of the party seeking to be excused. Fourth, that party must not have assumed a greater obligation than the law imposes." (footnotes omitted)).

Although the present rule is less strict than its inflexible ancestor, it, nevertheless, remains a difficult standard to meet.

> Substituting the term 'impracticability'—instead of the historical usage of 'impossibility'—better expresses the extent of the increased legal burden that is required. That is, while it remains difficult to prove that something is impracticable, that legal excuse is broader than having to prove that something is impossible.... While impracticability embraces situations short of absolute impossibility, mere increase in difficulty is not enough.

30 Williston on Contracts § 77:1, at 277–78.[10]

## B. Applying Doctrine of Impracticability to the Present Case

Turning to the case at hand, we will now consider the doctrine of impracticability in

10. Likewise, the companion rule to the rule of impracticability mentioned in the foregoing footnote, discharge by supervening frustration as set out in the Restatement (Second) of Contracts § 265, proves to be a difficult standard to meet. Indeed, Comment *a* to § 265 states, in relevant part:

> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had

in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as

light of the facts and lower court decision before us on appeal. Because we have herein announced a new principle of law with respect to the doctrine of impracticability, we will provide some discussion of each of the test's factors. However, because a decision on each of the factors is not necessary to our resolution of this case, and because some factors were not considered by the circuit court or addressed by the parties, we will reach conclusions only as to those factors that were addressed below.

**■■ 1. The event made the performance impracticable.** The issue of the impracticability of performance is elaborated on in Comment *d* to the Restatement (Second) of Contracts § 261 as follows:

Events that come within the rule stated in this Section are generally due either to "acts of God" or to acts of third parties.... Performance may be impracticable because *extreme and unreasonable* difficulty, expense, injury, or loss to one of the parties will be involved. A severe shortage of raw materials or of supplies due to war, embargo, local crop failure, unforeseen shutdown of major sources of supply, or the like, which either causes a marked increase in cost or prevents performance altogether may bring the case within the rule stated in this Section. Performance may also be impracticable because it will involve a risk of injury to person or to property, of one of the parties or of others, that is disproportionate to the ends to be attained by performance. *However, "impracticability" means more than "impracticality." A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed-price contract is intended to cover. Furthermore, a party is expected to use reasonable efforts to surmount obstacles to performance (see*

§ *205), and a performance is impracticable only if it is so in spite of such efforts.*

(Emphasis added). It is additionally explained, in *Comment e* to Section 261, that:

It is sometimes said that the rule stated in this Section applies only when the performance itself is made impracticable, without regard to the particular party who is to perform. The difference has been described as that between "the thing cannot be done" and "I cannot do it," and the former has been characterized as "objective" and the latter as "subjective." *This Section recognizes that if the performance remains practicable and it is merely beyond the party's capacity to render it, he is ordinarily not discharged,* but it does not use the terms "objective" and "subjective" to express this. Instead, *the rationale is that a party generally assumes the risk of his own inability to perform his duty. Even if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged because of a failure by that party because this is also a risk that is commonly understood to be on the obligor.*

(Emphasis added) (citations omitted). As the foregoing comments demonstrate, a party relying on a defense of impracticability must show more than a mere increase in difficulty and/or cost to be excused from performance of a contractual obligation. In addition, one seeking relief under the doctrine of impracticability must have made reasonable efforts to overcome the obstacles to performance. *See Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 842 (2d Cir.1975) ("The party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract." (citations omitted)).

**■** The circuit court explained its finding of impossibility of performance, in part, thusly:

Additionally, § 265 comports with the requirements of § 261 in that the party claiming supervening frustration may not be at fault in causing the occurrence of the events that resulted in the frustration.

within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

5. On the final date for closing set by the contract of September 6, 2002, transfer of the real estate was an impossibility given the requirement of a clear title at the time of transfer of the real estate, and given that the deeds of trust on the subject real estate had not been released and could not be released on the date set for closing.

Clearly, then, the basis for the circuit court's finding of impossibility was the failure to obtain the needed releases by the closing date established by the final contract between the parties. However, we find that the circuit court's conclusion in paragraph five, that "the deeds of trust on the subject real estate ... could not be released on the date set for closing," does not appear to be supported by the evidence of record. At trial, Attorney Ours was the only witness to provide testimony with respect to the length of time required to obtain releases of the deeds of trust. Attorney Ours stated that it was his recollection that a representative for the holder of the first deed of trust advised him that it might take a month to obtain a release of the first lien. He explained that there were four requirements that had to be met to acquire the release. Attorney Ours testified that three of these requirements had been met in the first day. The only remaining requirement was to obtain an appraisal of the property including the forty-eight acres, and an additional appraisal establishing the property's value without the forty-eight acres.[11] Attorney Ours stated that he had been contacted by an appraiser hired by the Rigglemans who was seeking instruction as to exactly what he was to do. Thereafter Attorney Ours was notified that the Rigglemans did not wish to proceed with the sale, so he was not aware what ultimately transpired with respect to the appraisals or releases.

Based upon the undisputed testimony of Attorney Ours, the evidence indicates that the releases needed to clear title could have been obtained in a month, or possibly less, given the progress that had been quickly achieved prior to the Rigglemans decision to rescind the contract. The original contract, which was prepared by Attorney Ours, was signed on July 5, 2002. Thus, two months prior to the initial closing date of September 5, and approximately two-and-one-half months prior to the final closing date of September 20, it was known that steps needed to be taken to clear the title to the land.[12]

Viewing the foregoing facts in the light most favorable to Mr. Waddy, as we are required to do, we simply cannot reach the conclusion that releases of the deeds of trust on the subject real estate could not have been obtained by the date set for closing. The evidence indicates that it was expected to take one month to obtain the releases. The Rigglemans had approximately two-and-one-half months from the date the first contract with Mr. Waddy was executed until the date set for closing. Moreover, it has been said that "[t]he mere fact that performance of a promise is made more difficult and expensive than the parties anticipated when the contract was made ordinarily will not excuse a promisor, a rule [that] is so well established that it needs no citation to authority." 30 Williston on Contracts § 77.1, at 286.

**2. The nonoccurrence of the event was a basic assumption on which the contract was made.** The "basic assumption" factor also is discussed in the comments to section 261 of the Restatement (Second) of Contracts, where it is explained in Comment *b* that

[i]n order for a supervening event to discharge a duty under this Section, the nonoccurrence of that event must have been a "basic assumption" on which both parties made the contract (see Introductory Note to this Chapter). This is the criterion used by Uniform Commercial Code § 2–615(a). Its application is simple enough in the

---

**11.** The forty-eight acres were merely a portion of a larger tract of land owned by the Rigglemans. It was the larger tract as a whole that was encumbered by the deeds of trust.

**12.** Attorney Ours did not undertake any title research until September 8, 2002. When asked the question, "[s]o if those four things could have been done back in July, you could have potentially have made it?" Attorney Ours answered: "Oh, yes. Mr. Judy, in hindsight, you know, it's a curse. I probably should have gone to the Court House within the first week, as scheduling goes, this, that and the other, I didn't."

cases of the death of a person or destruction of a specific thing necessary for performance. The continued existence of the person or thing (the non-occurrence of the death of [sic] destruction) is ordinarily a basic assumption on which the contract was made, so that death or destruction effects a discharge. Its application is also simple enough in the cases of market shifts or the financial inability of one of the parties. The continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule state in this Section. In borderline cases this criterion is sufficiently flexible to take account of factors that bear on a just allocation of risk. The fact that the event was foreseeable, or even foreseen, does not necessarily compel a conclusion that its non-occurrence was not a basic assumption. See Comment *c* to this Section and Comment *a* to § 265.

The introductory note to Chapter eleven of the Restatement (Second) of Contracts, which contains the various rules related to impracticability of performance, further states, in part:

Determining whether the non-occurrence of a particular event was or was not a basic assumption involves a judgment as to which party assumed the risk of its occurrence. In contracting for the manufacture and delivery of goods at a price fixed in the contract, for example, the seller assumes the risk of increased costs within the normal range. If, however, a disaster results in an abrupt tenfold increase in cost to the seller, a court might determine that the seller did not assume this risk by concluding that the non-occurrence of the disaster was a "basic assumption" on which the contract was made. In making such determinations, a court will look at all circumstance, including the terms of the contract. The fact that the event was unforeseeable is significant as suggesting that its non-occurrence was a basic assumption. However, the fact that it was foreseeable, or even foreseen, does not, of itself, argue for a contrary conclusion, since the parties may not have

thought it sufficiently important a risk to have made it a subject of their bargaining. Another significant factor may be the relative bargaining positions of the parties and the relative ease with which either party could have included a clause.

Because our determination of this case is resolved by other factors in this test, and because the circuit court made no decision with respect to this particular factor, we decline to address its application to the facts at bar.

■■■ **3. The impracticability resulted without the fault of the party seeking to be excused.** The Rigglemans claim that they "did everything they could to cooperate with any requirement necessary to sell the real estate within the time of closing, and they did nothing to impede the progress of the sale of the real estate." This is simply not borne out by the evidence contained in the record.

■■■ Under the plain language of each of the three contracts executed between the Rigglemans and Mr. Waddy, the Rigglemans agreed "to convey the subject real estate in fee simple, with covenants of general warranty of title, *free and clear of all liens and encumbrances.*" They further agreed that *"any defects in title shall be cured by the Sellers [the Rigglemans] prior to closing."* Finally, the Rigglemans agreed to "pay for ... the attorney fees for any necessary releases, *and all costs associated with eliminating any defects in title.*" We have held that " '[w]here the terms of a contract are clear and unambiguous, they must be applied and not construed.' Syl. Pt. 2, *Bethlehem Mines Corp. v. Haden*, 153 W.Va. 721, 172 S.E.2d 126 (1969)." Syl. pt. 2, *Orteza v. Monongalia County Gen. Hosp.*, 173 W.Va. 461, 318 S.E.2d 40 (1984). *See also,* Syl. pt. 3, *Bennett v. Dove*, 166 W.Va. 772, 277 S.E.2d 617 (1981) (" 'It is the safest and best mode of construction to give words, free from ambiguity, their plain and ordinary meaning.' *Williams v. South Penn Oil Co.*, 52 W.Va. 181, 43 S.E. 214 (1902), Syllabus Point 4."); Syl. pt. 1, *Cotiga Dev. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962) ("A valid written instrument which expresses the

intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent."). Plainly, the Rigglemans contracted to accept the duty of clearing the title of all liens and encumbrances prior to closing, and of paying the costs to do so.

With respect to the issue of fault as it relates to the doctrine of impracticability, it has been explained that,

[i]f the event that prevents the obligor's performance is caused by the obligee, it will ordinarily amount to a breach by the latter and the situation will be governed by the rules stated in Chapter 10, without regard to this Section .... *If the event is due to the fault of the obligor himself, this Section does not apply. As used here "fault" may include not only "willful" wrongs, but such other types of conduct as that amounting to breach of contract or to negligence....*

Comment d, Restatement (Second) of Contracts § 261. *See also Bunch v. Potter,* 123 W.Va. 528, 532, 17 S.E.2d 438, 440 (1941) (" 'It is the duty of contracting parties to provide against contingencies, as they are presumed to know whether the completion of the duty they undertake be within their power.' " (citation omitted)). Moreover,

[w]hatever meaning is given to the term "[impracticability]," whether it be objective or subjective, and even though it be used to include varying degrees of difficulty and expense, courts usually hold that the supervening event does not excuse a promisor from the contractual duty if the promisor willfully brought about the supervening event, or if the promisor could have foreseen and avoided it by the exercise of reasonable diligence. When one makes a contractual promise, the legal duty thereby created implies at least a reasonable degree of effort and diligence. If the exercise of such diligence would have resulted in performance, the promisor cannot say that performance was prevented by supervening impossibility. It was prevented by the promisor's own willful or negligent conduct or omission. Performance may have eventually become impossible, but the promisor is responsible for causing the impossibility.

14 Corbin on Contracts § 74.16, at 98 (footnote omitted). Thus, the fact that the Rigglemans delayed in seeking the releases may not be used by them as an excuse for nonperformance.

A party cannot by its own act place itself in a position to be unable to perform a contract, then plead that inability to perform as an excuse for nonperformance. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 2465, 135 L.Ed.2d 964 (1996) (plurality opinion); *Miles Homes Div. of Insilco Corp. v. First State Bank of Joplin,* 782 S.W.2d 798, 802 (Mo.Ct.App. 1990); *Arnett v. USX Corp.,* 763 S.W.2d 169, 171 (Mo.Ct.App.1988); *see also Restatement (Second) of Contracts section 261.* A party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract. *Matter of Financial Corp.,* 17 B.R. 497, 504 (Bankr.W.D.Mo.1981).

*Farmers' Elec. Coop., Inc. v. Missouri Dep't of Corr.,* 977 S.W.2d 266, 271 (Mo.1998) (per curiam).

To the extent that the Rigglemans, by their assertion that they "did everything they could to cooperate with any requirement necessary to sell the real estate within the time of closing, and they did nothing to impede the progress of the sale of the real estate," may be attempting to cast blame upon another for their failure to perform their contractual duty, we are not persuaded. "Even if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged because of a failure by that party because this is also a risk that is commonly understood to be on the obligor." Comment *e,* Restatement (Second) of Contracts § 261.

Because the evidence of record tends to indicate that the inability to obtain the needed releases was brought about by the Rigglemans' own neglect, we find the circuit court erred in granting judgment as a matter of law in their favor.

**4. Performance in Spite of Impracticability.** This fourth element recognizes that a party may agree to perform a duty notwithstanding that some event has rendered performance impracticable. The Restatement explains this concept thusly:

A party may, by appropriate language, agree to perform in spite of impracticability that would otherwise justify his nonperformance under the rule stated in this Section. He can then be held liable for damages although he cannot perform. Even absent an express agreement, a court may decide, after considering all the circumstances, that a party impliedly assumed such a greater obligation. In this respect the rule stated in this Section parallels that of Uniform Commercial Code § 2–615, which applies "Except so far as a seller may have assumed a greater obligation ...." Circumstances relevant in deciding whether a party has assumed a greater obligation include his ability to have inserted a provision in the contract expressly shifting the risk of impracticability to the other party. This will depend on the extent to which the agreement was standardized (cf. § 211), the degree to which the other party supplied the terms (cf. § 206), and, in the case of a particular trade or other group, the frequency with which language so allocating the risk is used in that trade or group (cf.§ 219).... If the supervening event was not reasonably foreseeable when the contract was made, the party claiming discharge can hardly be expected to have provided against its occurrence. However, if it was reasonably foreseeable, or even foreseen, the opposite conclusion does not necessarily follow. Factors such as the practical difficulty of reaching agreement on the myriad of conceivable terms of a complex agreement may excuse a failure to deal with improbable contingencies. See Comment *b* to this Section and Comment *a* to § 265.

Comment c, Restatement (Second) of Contracts § 261. Likewise, another commentator has stated

If a party expressly undertakes to perform, even though performance becomes impracticable, impracticability will not be

an excuse, and the party will be liable for damages for nonperformance. Even absent an express assumption of a greater obligation, a court may find, by negative implication from a clause excusing a party on the occurrence of some specified events, that the party assumed the risk of some other event. Furthermore, the surrounding circumstances will sometimes justify an inference that a party assumed the risk of impracticability. For example, a manufacturer that has contracted with the government to produce a product by means of a technological breakthrough has generally been held to have assumed the risk that achieving it may be impracticable....

It is sometimes said that if an event is foreseeable, a party that makes an unqualified promise to perform necessarily assumes an obligation to perform, even if the occurrence of the event makes performance impracticable. Admittedly there are cases, as the [Uniform Commercial] Code commentary explains, "when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered term...."

E. Allan Farnsworth, Farnsworth on Contracts § 9.6, at 552–54 (footnotes omitted).

Because we have found that, as the evidence currently stands in the record, the Rigglemans have failed to establish that they should be excused from their performance of the contract, it is not necessary for us to apply this particular element of the test.

**5. In Summary.** Based upon the foregoing discussion, we find that the circuit court erred in granting judgment as a matter of law in favor of the Rigglemans. While the Rigglemans might be able to put on their own evidence establishing impracticability, proof of impracticability has not been established on the record that was before the circuit court at the close of Mr. Waddy's case. Consequently, we reverse the circuit court's grant of judgment as a matter of law in favor of the Rigglemans, and remand this

case for further proceedings.[13]

### B. Time of the Essence

Mr. Waddy next argues that the circuit court erred in holding that time was of the essence in performing the contract. Mr. Waddy contends that if parties to a contract for the sale and purchase of land desire to make time of the essence, they should so stipulate in the contract. The Rigglemans respond that the circuit court correctly determined that time was of the essence of the contract. The Rigglemans cite Syllabus point 2 of *Creasy v. Tincher*, 154 W.Va. 18, 173 S.E.2d 332 (1970), which holds that "[i]n determining whether time is of the essence of a contract the intention of the parties is the paramount consideration and such intention may be manifested either by the language of the contract or by the actions of the parties."

We need not, however, decide whether time was of the essence to the contract underlying this dispute. Assuming, without deciding, that time was of the essence, the Rigglemans may not avail themselves of this principle as a defense.

When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at or within the time specified in the contract is essential *in order to enable that party to require performance from the other party.* It does not simply mean that delay will give rise to a right of action against that party, although the breach of any promise in a contract, including one dealing with the time of performance, will have that effect. Nor does the phrase merely mean that performance on time is a material matter, but rather, that it is so material that exact compliance with the terms of the contract in this respect is essential to the right to require counterperformance.

15 Williston on Contracts § 46:2, at 395–97 (footnotes omitted). As the foregoing quote demonstrates, a claim that time is of the essence is properly used to enable a party to require performance from the other party to a transaction. Likewise, a claim that time is of the essence of a contract may be asserted in order to prove that the other party's failure to act is a material breach of the contract. "Where time is of the essence in the performance of a contract, a delay in performance beyond the period specified in the contract, unless caused by the other party or waived by such party, will constitute a breach of the contract, entitling the aggrieved party to terminate it." Syl. pt. 2, *Elkins Manor Associates v. Eleanor Concrete Works, Inc.*, 183 W.Va. 501, 396 S.E.2d 463 (1990). *See also* 17B C.J.S. *Contracts* § 578c., at 261 ("When time is of the essence to a contract, performance must occur within the specified time. Performance after that time will not be sufficient, unless consented to by the other party, and a failure to perform a contract within the time specified may be a material

---

**13.** The circuit court also expressly based it's decision on a letter dated September 27, 2003, from J. David Judy, III, as counsel for the Rigglemans, to Attorney Ours. The general purpose of the letter was to advised counsel for Mr. Waddy that the Rigglemans did not intend to go forward with the sale of the real estate. With respect to this letter, the circuit court stated:

The Court has reviewed a letter dated September 27, 2002, attached to the pleadings in this matter which was sent by counsel for the Defendants to attorney Ours setting forth the position of the Defendants as of that date, that the Defendants were considering the contracts to be null and void based upon the untimeliness of the expected releases of property, and the impossibility of closing on the date required within the contract of September 6, 2002. The Court finds that this matter should have been concluded upon the receipt of that letter dated September 27, 2002, and none of

these proceedings should have gone forward after that date.

We are troubled by the circuit court's conclusions with regard to this letter. The contracts between Mr. Waddy and the Rigglemans included no provision regarding the circumstances under which the contract could be rescinded by either party. In essence, the circuit court's conclusion that "this matter should have been concluded upon the receipt of that letter dated September 27, 2002," grants to the Rigglemans a unilateral right to rescind the contract that was not bargained for by either party. This the circuit court is not entitled to do. *See* Syl. pt. 1, *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 468 S.E.2d 712 (1996) (" ' "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract *or to make a new or different contract for them.*" ' " (internal citations omitted)).

breach of the contract" (footnotes omitted)); 15 Williston on Contracts § 46:3, at 399–400 ("[I]f the parties also provide that time is of the essence, in those or equivalent words, they effectively agree that a breach of that promise is material or, in other words, that timely performance is in effect an express condition precedent to the promisee's duty to render the counterperformance under the contract." (footnotes omitted)). The Rigglemans simply may not assert that time was of the essence as an excuse for their nonperformance of their duty to cure any defects in the title to the land being sold to Mr. Waddy. For this reason, we find the circuit court erred by relying on time being of the essence in granting judgment as a matter of law to the Rigglemans.

### C. Dismissal of Mr. Waddy's claims against C. Fred Ours and Carol A. Ours

Because we have reversed the circuit court's grant of judgement as a matter of law in favor of the Rigglemans and have remanded this case for further proceedings, we find the dismissal of defendant's C. Fred Ours and Carol A. Ours was premature. If, on remand, Mr. Waddy should prevail in his claims against the Rigglemans, then the claims he has asserted against Mr. and Mrs. Ours would be ripe for adjudication. Consequently, we reverse the circuit court's dismissal and reinstate Mr. Waddy's claims against C. Fred Ours and Carol A. Ours.

### IV.

### CONCLUSION

For the reasons explained in the foregoing opinion, the July 7, 2003, order of the Circuit Court of Grant County is reversed, and this case is remanded for further proceedings not inconsistent with this opinion.

Reversed and Remanded.