576 S.E.2d 540

Karen H. GLASCOCK and William K. Glascock, Plaintiffs Below, Appellants,

v.

CITY NATIONAL BANK OF WEST VIRGINIA, Successor–In–Interest to Blue Ridge Bank, Defendant Below, Appellee.

No. 30595.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 29, 2002.

Decided Dec. 9, 2002.

James P. Campbell, Esq., Campbell Miller Zimmerman, P.C., Leesburg, for Appellants.

Martin R. Smith, Esq., Joseph K. Reeder, Esq., Roger A. Decanio, Esq., Smith & Thompson, Charleston, John W. Alderman, Esq., General Counsel, City National Bank, Cross Lanes, for Appellee.

McGRAW, Justice.

Appellants William and Karen Glascock challenge the lower court's award of summary judgment in favor of appellee City National Bank (successor in interest to Blue Ridge Bank). Appellants entered into a loan agreement with the bank for a construction loan. Appellants alleged that they were damaged by the bank's failure to disclose an unfavorable home inspection report. The lower court granted the bank's motion for summary judgement on the basis that the bank simply had no duty to disclose the unfavorable report. Because we find under the particular facts of this case that a special relationship arose between the bank and the appellants, which imposed a duty to disclose upon the bank, we reverse.

## I.

### FACTS

In the summer of 1994, appellants William and Karen Glascock entered into a construction loan agreement with Blue Ridge Bank

(later bought by successor in interest and appellant City National Bank)[1] for a $150,000 loan so that they could have a new home constructed in Harpers's Ferry. In conjunction with this loan the appellants, on August 11, 1994, signed a document called a "Construction Permanent Commitment Letter," which included the statement, "[i]nspections required with respect to this loan are solely for the bank's benefit; borrowers shall receive no comfort or rights with respect to such inspections or bank's evaluation thereof."

In August of 1994, the Glascocks' first contractor began construction of the house. As is usually the case with matters that reach their ultimate resolution in this Court, things did not go well. As early as September 1994 the Glascocks had concerns about the quality of the construction and made their concerns known to the bank. A memo from the bank suggests that a representative of the bank met with or communicated with the Glascocks and their contractor to discuss the problems with the construction project. The memo reveals that the bank requested a structural inspection of the house by a third party inspector, with the cost of the inspection to be paid out of the proceeds of the construction loan—that is, the bank would pay for the inspection, but out of the money it was already lending the Glascocks. The bank's memo also stated that no work was to be completed (other than some framing work), and the bank would not disburse any funds until the bank had "results from engineers and agreement is reached between [sic] Glascocks, builder, and Blue Ridge Bank." [2]

The result of this inspection was a report dated October 20, 1994 from a company called Pecora Engineering,[3] which revealed many defects in the construction of the house. It appears from the record that both the bank and the Glascocks received a copy of this report. The Glascocks subsequently fired their first contractor in late October 1994. About two months later, in late December 1994, the Glascocks hired another contractor who worked on the house into the summer of the next year.

Although the original six-month term of the construction loan had expired December 29, 1994, the Glascocks and the Bank continued to operate under the original agreement. During the first half of 1995, the second contractor continued work on the house and the Glascocks had several inspections made by a firm by the name of Structural Concepts. Structural Concepts inspected the construction project in January, March, and June of 1995. The resulting reports indicated problems with the second contractor as well. In July 1995, the project suffered another significant setback when the Glascocks fired their second contractor, with the house not yet complete.

The Glascocks had Structural Concepts inspect the house at least two more times in 1995, in the months of November and December.[4] In late October 1995, the bank, independent from the Glascocks, hired Robert Lemon of Blue Line Inspections to conduct yet another independent inspection of

---

1. Most, if not all, of the events of this case involve Blue Ridge Bank and not City National Bank. Because City National has since absorbed Blue Ridge, we shall refer simply to "the bank" in this opinion.

2. The September 30, 1994 memo reads as follows:

> MEMO: Glascock Loan File
> DATE: September 30, 1994
> SUBJECT: Glascock/Hines Meeting
> After hearing both sides of dispute, I have requested a structural inspection by Ruckman Engineering. Fees for this inspection and additional fees if required will be paid from the construction loan proceeds.

> No further work is to be completed other than framing a new pitch and extending the size of loft.
> No draws will be disbursed until I have results from engineers and agreement is reach between Glasscocks, builder, and Blue Ridge Bank.
> cc: Glasscocks
>     Hines

3. Although the memo mentions Ruckman Engineering, apparently it was Pecora Engineering that actually completed the inspection and report.

4. The record suggests the Glascocks also had inspections performed in September 1996, July 1998, and February 1999.

the home. The aptly titled "Lemon Report," dated November 11, 1995, revealed numerous problems in the home's construction, including serious defects in the house's exterior siding, sub-flooring, and electrical system. The Glascocks allege that, prior to litigation, neither the bank nor Mr. Lemon provided the Glascocks with a copy of this report or ever revealed its contents to them.

It also appears from the record that by the time of the Lemon Report, the bank had already disbursed all or most of the $150,000 loan amount. With the money already disbursed and the original six-month term of the construction loan long expired, the bank proposed a modification agreement that would convert the construction loan into a more traditional loan. The Glascocks approved, apparently after consultation with a lawyer, the conversion of the loan in December of 1995.[5]

The Glascocks filed suit against the bank on February 24, 2000, alleging that the bank should have revealed the contents of the report before inducing them to convert the construction loan into a more traditional loan.[6] They alleged that the bank had a duty to disclose the report to them, that it breached this duty by not providing them with a copy, and that they were damaged as a result. Specifically they claimed that they would not have agreed to convert the loan, and that they could have avoided many unnecessary expenses by fixing some or all of the problems at an earlier stage. Because the bank did not disclose the report, alleged the Glascocks, they did not discover these problems until later and considerable additional work was performed that would have to be undone to repair the house.

The lower court granted summary judgment in favor of the bank, finding that the bank simply had no duty to disclose the report. Because we find that, under the narrow facts of this construction loan case, that a "special relationship" existed between the bank and the Glascocks, we believe that the trial court erred in granting summary judgment, and reverse.

## II.

## STANDARD OF REVIEW

■ Our standard of review for a lower court's grant of summary judgment is well established:

> "A circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). A party moving for summary judgment faces a well-established burden: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Surety Co. v. Federal Insur. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

*Mallet v. Pickens,* 206 W.Va. 145, 147, 522 S.E.2d 436, 438 (1999). *Accord, Antco, Inc. v. Dodge Fuel Corp.,* 209 W.Va. 644, 550 S.E.2d 622 (2001). With this standard in mind, we turn to a discussion of the instant case.

## III.

## DISCUSSION

Among the various theories of liability argued by the Glascocks, we find most persuasive the Glascocks' argument that the specific facts of their dealings with the bank give rise to a "special relationship" between the two parties, and that this special relationship im-

---

5. This construction loan had an initial interest rate of 7.5% and was an "interest only" loan that required no payment of principal. After the Glascocks approved the conversion of the loan in December of 1995, the loan had an adjustable rate, initially 7.75%, a 30–year term, and the expectation that the Glascocks would pay both principal and interest in each payment. Subsequently, the rate on this loan decreased to 7.01% in December 1998, and to 6.65% in December 2001. It is not clear from the record how much,

if any, of this loan remains unpaid, or what the recent payment history of the loan has been.

6. The record indicates that the Glascocks were sued by one of their contractors. The Glascocks filed a counterclaim and ultimately won a jury verdict of $125,000 against the contractor. It appears that this action against the bank was not pursued until that litigation ended.

parted a duty to the bank to disclose the information.

We recently discussed the concept of a "special relationship" in a case where a contractor, doing work on a sewer repair project for the City of Salem, sued the design firm that had developed the construction plans. In *Eastern Steel Constructors, Inc. v. City of Salem*, 209 W.Va. 392, 549 S.E.2d 266 (2001), the City of Salem contracted with an engineering and design firm, Kanakanui Associates, to draw up plans for a new sewage treatment plant and several new sewer lines. The city later contracted with Eastern to perform some of the sewer line work. Eastern suffered delays and added construction expenses when it encountered unexpected utility lines and underground rock formations in the path of the new line, which had not been revealed in the plans completed by Kanakanui.

■ Eastern sued Kanakanui, among others, and the lower court ruled in favor of Kanakanui, in part because Kanakanui had contracted only with the city, had prepared the plans for the city, and had not contracted with Eastern. The Court in *Eastern* reversed the lower court and held that a design professional like Kanakanui owed a duty of care to a contractor like Eastern:

> A design professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the design professional, due to the special relationship that exists between the two. Consequently, the contractor may, upon proper proof, recover purely economic damages in an action alleging professional negligence on the part of the design professional.

Syl. pt. 6, *Eastern Steel Constructors, Inc. v. City of Salem*, 209 W.Va. 392, 549 S.E.2d 266 (2001).

■ In so holding, the *Eastern* Court relied upon the case of *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988), and the

basic tort principles espoused therein. In that case the Sewells bought, from the original owner, a four-year-old house built by the defendant contractor. Rainfall caused flooding in the house shortly after the Sewells moved in and they sued the builder. The lower court ruled in favor of the builder on the basis that he had not sold the house to the Sewells. This Court reversed and held that:

> In the matters of negligence, liability attaches to a wrongdoer, not because of a breach of a contractual relationship, but because of a breach of duty which results in an injury to others.

Syl. pt. 2, *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988). Then the Court considered the question of whether a builder owed any duty to subsequent purchasers of a house. Finding that other courts in the country had allowed similar negligence actions, the Court explained that the builder owed such a duty "because it is entirely foreseeable that there will be subsequent owners of the houses built." *Id.* 179 W.Va. at 588, 585, 371 S.E.2d at 85. The court then held:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Syl. pt. 3, *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988). The Court in *Eastern* relied upon both of these syllabus points because of their succinct crystallization of general tort principles, long established in West Virginia law and in harmony with national trends.

> In so holding in Sewell, we were in accord with Justice Cardozo's celebrated maxim: "The risk reasonably to be perceived defines the duty to be obeyed . . . ." *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928).

*Mallet v. Pickens*, 206 W.Va. 145, 155, 522 S.E.2d 436, 446 (1999).

The Court in *Eastern* also relied heavily upon the case of *Aikens v. Debow*, 208 W.Va.

486, 541 S.E.2d 576 (2000). Mr. Aikens owned a motel near an interstate exit on interstate 81 near Martinsburg, West Virginia. Mr. Debow was driving a truck that struck the overpass serving Mr. Aikens' exit, forcing the closure of the overpass for several weeks. Mr. Aikens sued Mr. Debow, claiming that his business suffered because many potential customers could not reach his motel while the overpass was closed. The lower court certified a question asking whether a plaintiff in Mr. Aikens' position could recover.

■ This Court ultimately ruled against Mr. Aikens, but established in its opinion the possibility of recovery in other cases where a plaintiff and defendant have a closer nexus.

> An individual who sustains economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

Syl. pt. 9, *Aikens v. Debow,* 208 W.Va. 486, 541 S.E.2d 576 (2000). It is this notion of "special relationship" that formed the foundation of our holding in *Eastern* and provides a basis for our decision in this case.

■ The facts before us show that the bank was significantly involved in the construction of the Glascock home. The Glascocks did not receive a lump sum, but had to present receipts or bills to the bank before the bank would disburse the funds. The bank itself requested the first inspection report (from Pecora Engineering) apparently for the bank and the Glascocks to share. As both the *Eastern* and the *Aikens* opinions noted:

> The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrongdoing, the persons likely to be injured, and the damages likely to be suffered. Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus.

*Eastern,* 209 W.Va. at 398, 549 S.E.2d at 272 (quoting *Aikens v. Debow,* 208 W.Va. 486, 499, 541 S.E.2d 576, 589 (2000)).

In this case, the bank possessed information of no interest to "society in general," but of great interest to the Glascocks. The bank had reason to know of the "potential consequences of the wrongdoing," that is, withholding the information. The report contains information that major components of the house, including the siding and the sub-flooring, would need to be replaced. It states that the electrical systems might present a safety hazard, and reveals many other less significant problems with the house. In short, it was eminently foreseeable to the bank that withholding the information from the Glascocks could cause the Glascocks harm.[7]

We hasten to point out that we make no finding that withholding the report actually caused the Glascocks any harm. As the

---

7. The Glascocks suggest that we should extend our holding in *Logan Bank & Trust Co. v. Letter Shop, Inc.,* 190 W.Va. 107, 437 S.E.2d 271 (1993) to encompass their claim. *Logan Bank* involved a dispute between a lender and surety, who had helped secure a loan for a third party. This Court held in that case:

> We hereby adopt the disclosure rule in § 124 of the Restatement of the Law of Security (1941), which lists three prerequisites to finding that a creditor has a duty to disclose certain facts that it is aware of about the debtor to the surety. These conditions are: (1) "the creditor has reason to believe" that the facts materially increase the surety's risk "beyond that which the surety intends to assume;" (2) the creditor "has reason to believe that the facts are unknown to the surety;" and (3) the creditor "has a reasonable opportunity to communicate the facts to the surety."

*Id.* at syl. pt. 3, 437 S.E.2d 271. While we feel this logic is in harmony with our decision in the instant case, we believe that *Logan Bank* is not directly applicable to appellants' case.

bank points out, it is likely that the Glascocks had no choice in converting their loan, and it is clear from the record that the Glascocks had their own inspectors examine the home at least half a dozen times, both before and after the Lemon inspection. A jury might well conclude that the bank's retention of the report did not harm the Glascocks at all. But we feel a jury should have the opportunity to decide these questions.

■ In conclusion, we find that, where a lender making a construction loan to a borrower creates a special relationship with the borrower by maintaining oversight of, or intervening in, the construction process, that relationship brings with it a duty to disclose any information that would be critical to the integrity of the construction project.[8]

■ As we held in *Eastern,* whether or not such a special relationship exists must be determined on a case-by-case basis. Our ruling should not be taken to mean that a traditional lender is in any way the insurer of the property that is the subject of the loan. Nor is the lender an insurer of the work performed or of an inspection or appraisal conducted on its behalf. Our ruling does not ask lenders to be engineers, or architects, or home inspectors. As we stated, the duty is defined by the risk perceived. If the lender does not have information critical to the integrity of the construction project, then the lender, of course, could not have a duty to disclose.

Banks are, of course, free to lend money to people to buy perfect houses or houses on the verge of collapse as long as that decision is reached by informed parties. We are simply ruling that, where a bank and a lender have a special relationship, the bank has a duty to disclose information when the bank could reasonably foresee that withholding that information might damage the borrow-

ers. We hasten to point out that a lender can always (as the bank in this case could have done) immunize itself from a suit such as this by simply making a copy of the information it has and mailing it to the borrower.

Because we have found that a special relationship exists between the parties, genuine issues of material fact remain, and the lower court's grant of summary judgment must be reversed.

## IV.

## CONCLUSION

For the reasons stated, the order of the Circuit Court of Jefferson County is reversed, and this case is remanded to the circuit court.

Reversed and remanded.

Justice MAYNARD concurs in part and dissents in part and reserves the right to file a separate opinion.

MAYNARD, Justice, dissenting, in part, and concurring, in part.

I agree with the majority that a lender creates a special relationship with a borrower when the lender maintains oversight of, or intervenes in, the construction process. I also agree with the majority that once a special relationship is created, the lender must disclose to the borrower any information that would be critical to the integrity of the construction project. However, I do not believe that under the facts of this case, the bank created the requisite special relationship with the Glascocks which necessitated disclosure of the bank's second inspection report. Consequently, I concur, in part, and dissent, in part, to the majority opinion.

---

**8.** In so holding, we are not unmindful of Justice Maynard's admonition:

> Courts have traditionally recognized that, "[a] line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. It is always tempting to impose new duties and, concomitantly, liabilities, regardless of the economic and social burden. Thus, the courts

have generally recognized that public policy and social considerations, as well as foreseeability, are important factors in determining whether a duty will be held to exist in a particular situation."

*Harris v. R.A. Martin, Inc.,* 204 W.Va. 397, 403, 513 S.E.2d 170, 176 (1998) (Maynard, J., dissenting) (quoting 57A Am.Jur.2d *Negligence* § 87, at 143 (1989)).

Initially, I note that the majority opinion details at least eight independent inspections which the Glascocks instituted. The bank's second inspection, performed by Robert Lemon, was completed after the Glascocks' third inspection was completed by Structural Concepts. The Glascocks had five inspections performed following the bank's second and final inspection. It appears to me that the Glascocks certainly should have had the same information available to them independent of the bank's report. In fact, the bank's second inspection was completed in October 1995. The Glascocks had inspections performed in November 1995 and in December 1995.

There is no evidence presented in this case that would lead to a conclusion that the Glascocks had an agreement with the bank whereby they would rely on the bank's structural inspections to uncover defects in the construction of the house. In fact, the Glascocks signed a document which stated, "Inspections required with respect to this loan are solely for the bank's benefit; borrowers shall receive no comfort or rights with respect to such inspections or bank's evaluation thereof."

Under these circumstances, I simply cannot find that a special relationship exists between the Glascocks and the bank. I believe the circuit court properly granted summary judgment to the bank.