700 S.E.2d 791

Anissa WHITE, Plaintiff
Below, Appellant,

v.

AAMG CONSTRUCTION LENDING CENTER; RG Crown Mortgage/RG Crown Bank; White Family Properties, LLC; Stephen L. White, II, Individually; Allied Home Mortgage Capital Corporation; and ABN AMRO Mortgage Group, Inc., Defendants Below, Appellees.

No. 35286.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 7, 2010.

Decided Sept. 16, 2010.

Paul M. Stroebel, Esq., Stroebel & Johnson, PLLC, Charleston, WV, for Appellant.

Kenneth E. Tawney, Esq., Amber L. Hoback, Esq., Kevin R. Waldo, Esq., Jackson Kelly, PLLC, Charleston, WV, for Appellee Fifth Third Bank.

PER CURIAM:

In this appeal from the Circuit Court of Kanawha County, we are asked to examine a construction loan by a bank to build a new house. The plaintiff—the owner of the new house—asserted that the defendant bank had a duty, in contract and in tort, not to distribute any money from the loan to the contractor building the house until the house had been inspected and the inspector had confirmed that the work being paid for was completed and in place. The plaintiff brought the instant suit alleging that the defendant bank had breached both duties, and could be held liable for breach of contract and for negligence. The plaintiff did

not allege that the bank's inspection failed to reveal any defective construction.

The circuit court, however, entered an order granting summary judgment to the defendant bank on both the contract and the tort claims. The plaintiff now appeals.

As we discuss below, after careful consideration of the record, the briefs, and the arguments of the parties, we reverse, in part, the circuit court's summary judgment order and find that the plaintiff has established sufficient questions of material fact to support her allegation that the bank may have breached its contract with the plaintiff. However, we affirm the circuit court's order dismissing the plaintiff's tort claims.

## I.

### *Background and Procedure*

In mid–2004, appellant and plaintiff-below Anissa White hired White Family Properties ("WFP") to build a new house on her land in Lincoln County, West Virginia. The total cost of construction by WFP was projected to be $193,500.00. The plaintiff gave WFP a check for $40,000.00 before construction commenced, to pay for the initial costs of construction.

To finance the remaining costs to build the new house, on January 28, 2005, plaintiff White signed a construction loan agreement to borrow up to $150,000.00 from a combination of entities (including ABN AMRO Mortgage Group, Inc., AAMG Construction Lending Center, Allied Home Mortgage Capital Corporation, and RG Crown Mortgage/RG Crown Bank). Those entities later sold the construction loan to the appellee and defendant-below, Fifth Third Bank ("the Bank").

The loan agreement signed by the plaintiff provided that the Bank would only disburse loan money in measured increments as construction progressed, and only for work that had been finished and was "in place." [1] Importantly, to ensure that construction work was "in place," the Bank repeatedly stated in

the loan documents that it would inspect the plaintiff's new house to gauge the extent of progress, and would only disburse money for completed work "based on the inspection." For example, the loan agreement states, in all capital letters:

> IF THE PROGRESS OF THE WORK IN PLACE IS NOT CONSISTENT WITH THE DRAW SCHEDULE, THE LENDER SHALL DISBURSE ONLY THE AMOUNT OF FUNDS THAT IT DETERMINES IS APPROPRIATE BASED ON THE INSPECTION OF THE PROGRESS OF THE WORK.

Likewise, a rider to the loan agreement (signed contemporaneously with the loan agreement) says:

> 2. Work In Place
>
> The Lender has agreed to make the loan herein described to be paid in installments as the work is completed and to disburse funds only FOR WORK IN PLACE, based upon inspection.

Additionally, the Bank provided the plaintiff with a "Construction Loan Disbursement Information Sheet"—a copy of which the plaintiff signed and left with the Bank—which again makes it clear that the Bank agreed to only release money for work on the house that an inspection had established had been completed:

> Disbursements will be made only after inspection of the property has been made to determine the status of completion ...
>
> Lender shall not release any draw unless:
>
> ...
>
> E. An inspector selected by Lender has certified that the WORK supporting the draw request is "IN PLACE".

The loan agreement states that the inspections were *solely* for the Bank's benefit to measure the extent of work that was "in place." The loan agreement makes it clear that the inspections were not to measure the quality of the construction work, and that the

---

1. The loan agreement states:

A. *Work In Place.* Other than the initial disbursement which may be applied to the purchase price of the Property and/or to the satisfaction of any liens against the Property ... all

disbursements of the Loan will be made as the construction progresses for "WORK IN PLACE ONLY" upon written request for payment submitted by Borrower to Lender ("Draw Requests")....

inspections were not for plaintiff White's benefit. The loan agreement says:

*Inspections of Apparent Status, Not Quality of Work:* All inspection services, if any, by Lender … are or shall be rendered solely for the benefit of Lender, and said inspections are not made for the benefit of, and shall not be construed to have been made for the benefit of Borrower…. Borrower acknowledges that such inspections shall not regard nature and quality of the work, but are intended only to appraise the Lender of the apparent progress thereof. Consequently, Borrower hereby exonerates, excuses and releases Lender from any and all claims of loss or damage that may be suffered by Borrower, which relate in any way to the quality of construction or lack thereof.

A rider to the loan agreement states to the same effect (with emphasis in the original):

INSPECTION FOR STATUS OF COMPLETION ONLY

The Lender shall inspect the project in order to ascertain the status of completion and the progress of the construction improvements. The sole purpose for Lender's inspection is to determine the approximate amount and value of the work which has been done, so that Lender may disburse funds for such work in place. Such inspections shall not require a review by Lender of the quality of the construction. **As Borrower, I will not rely on the Lender's inspection for any purpose whatsoever.** Rather, I will be solely responsible for the progress and quality of construction, and the discovery of all delays, defects, faults, imperfections and deviations from the Plans and Specifications shall be my sole responsibility as Borrower.

In spring 2005, WFP began construction on the plaintiff's new house. The construction contract between the plaintiff and WFP allowed the contractor to make five "draws" against the construction loan in tranches when the house was 20%, 45%, 70%, and 90% complete, with the final 10% to be drawn upon the completion of the house.

On July 18, 2005, plaintiff White signed[2] and submitted the first draw request form requesting that the Bank pay $48,375.00 for "work in place." The draw request form indicated that various tasks in the construction of the house had been completed. The Bank's inspection report showed the progress of construction to be at 30% completion, and a week later the Bank approved the first draw request and wire-transferred $48,375.00 to WFP.

On September 22, 2005, a second draw request in the amount of $48,395.00 was submitted for the Bank's approval. The Bank's inspection report showed the progress of construction to be at 55% completion, and on September 26, 2005, the second tranche of $48,395.00 was wired to WFP.

Plaintiff White's claims against the Bank appear to be based, in part, on the next three draw requests submitted in November and December 2005. As we understand the plaintiff's position, the plaintiff largely asserts that the Bank breached its contractual obligations, and was negligent, in its handling of these last three draw requests.

On November 7, 2005, the third draw request was submitted to the Bank in the amount of $34,393.00, which requested that the money be paid directly to WFP.[3] Like before, the draw request lists various tasks that had ostensibly been completed, and the contractual prices for those tasks.

The next day, the Bank deducted $6,125.00 from the draw request because the total price for the ostensibly completed construction tasks only added up to $28,268.00. The Bank then performed an inspection and found that much of the construction tasks had, in fact, not been completed. On Novem-

**2.** The draw request was also signed by WFP's construction supervisor, appellee Stephen L. White, II. Mr. White is apparently not related to the plaintiff.

**3.** The draw request bears a signature purporting to be the plaintiff's, but the plaintiff claims the signature is a forgery and that the form was submitted entirely by WFP. The Bank, however, asserts that whether or not the signature is a forgery is irrelevant, because the plaintiff executed a document that allowed WFP to act as her agent in requesting and receiving all draws against the loan.

ber 11, 2005, the Bank deducted another $27,693.00 from the draw, further reducing the amount of payment to just $575.00.[4]

The record then indicates that—despite the Bank's records and inspection showing that only $575.00 of work was "in place"—on November 15, 2005, the Bank wire-transferred $5,477.00 to WFP.

On November 28, 2005, the November 7th draw request for $34,393.00 was resubmitted to the Bank by WFP with the same inaccurate certifications regarding the work completed on the jobsite. The Bank refused to pay this request.[5]

On December 28, 2005, the November 7th draw request was again submitted to the Bank, but this time with several hand-written amendments. For instance, the total amount requested was only $32,650.00.

An inspection performed on January 4, 2006, revealed that construction on the new home was 80% complete. However, the inspection report specifically states that certain items—such as gutters and downspouts, garage doors, and exterior stairs—were not completed.

Still, on January 5, 2006, the Bank approved the entire requested amount of $32,650.00 for payment, and wire-transferred that amount to WFP. The Bank's documentation indicates that the payment was for items such as gutters and downspouts ($3,000.00), garage doors ($5,000.00), and exterior stairs ($2,000.00). The Bank's documentation revealed that the Bank had now paid WFP a total of $134,897.00, or 89.9% of the $150,000 approved loan amount.

On January 23, 2006, WFP stopped working on the plaintiff's new home.[6] On March 15, 2006, the Bank notified the plaintiff that her construction loan was in default, and her draw privileges against the loan were suspended. The new home has apparently never been completed.

Plaintiff White filed suit against defendant Fifth Third Bank on January 12, 2007, alleging that the Bank was in breach of contract, and that the Bank was negligent and/or reckless.[7] She alleged that the Bank had breached its duty to inspect the construction to ensure that the new home was at an appropriate stage of completion prior to disbursing payments or draws to the contractor.

After discovery was conducted by the parties, the Bank filed a motion for summary judgment seeking to have the plaintiff's two-count complaint against the Bank, for damages in contract and in tort, dismissed. First, the Bank asserted that the construction loan agreement specifically and repeatedly stated that inspections were solely for the benefit of the Bank, and not the plaintiff. Therefore, the Bank contended that the plaintiff could not base any contract

---

**4.** In a later deposition, the construction supervisor for WFP admitted that he had requested payment for work not completed, and that he was merely plugging in numbers to get the percentages to work out to equal his draw request. When the construction supervisor spoke to a representative for the Bank, he was apparently told he could not do that and that he would only receive payment for work completed.

**5.** At the same time, it appears that the construction supervisor for WFP called the plaintiff on Thanksgiving evening and informed her that the Bank owed him a lot of money and that he could not make payroll. In a deposition, the plaintiff indicated she called the Bank and was told that money could not be released from the loan because WFP "had been submitting draw requests for things that weren't finished." Shortly thereafter, the plaintiff gave WFP two cashier's checks totaling $21,000.00 from her own funds in order to keep WFP working.

**6.** As best we can discern from the record, by January 2006 WFP had been paid about $196,000.00 by the Bank and by the plaintiff for a house that was expected to cost $193,500.00. The construction supervisor for WFP told the plaintiff—because of changes to the original house plans by the plaintiff that were not put in writing—that he would need another $35,500 to complete the house.

**7.** The plaintiff also brought suit against White Family Properties and its supervisor, Stephen L. White, II, alleging that they had improperly obtained payments and/or draws against the loan for work that was not completed. The plaintiff alleged that these two defendants had breached the construction contract by not completing the home for the price contracted; were "negligent in the construction of certain aspects" of the plaintiff's home; and that they had engaged in fraud. These defendants were not impacted by the circuit court's order below, so we do not consider or discuss the causes of action alleged against them.

suit on the Bank's inspections. Second, the Bank argued that the plaintiff could not recover in a tort claim for negligence or recklessness because the plaintiff's damages were entirely economic and, essentially, contractual in nature. Under the "economic loss" doctrine, the Bank argued that the plaintiff could not convert her contractual damage claim into a tort claim.

In an order dated February 4, 2009, the circuit court granted the Bank's motion for summary judgment. The circuit court found that under the language of the construction loan agreement, the Bank merely had "rights, not obligations" to conduct inspections. The circuit court also found that the loan agreement was clear that the inspections were solely for the benefit of the Bank, and that the plaintiff was not entitled to rely on the inspections or base her cause of action on the inspections. The circuit court therefore concluded that there was no disputed issue of material fact, and dismissed the plaintiff's breach of contract claim against the Bank.

As to the plaintiff's negligence and/or recklessness claims against the Bank, the circuit court found that the plaintiff's complaint only sought damages for economic harm, not for personal injury or property damage. The circuit court found that the parties' rights and duties were defined by the contract, not the common law—and that, essentially, "[t]his is a classic case of inappropriate tort claims based upon alleged breaches of contractual duties." The circuit court therefore concluded that summary judgment was proper to dismiss the plaintiff's tort claims against the Bank.

The plaintiff now appeals the circuit court's February 4, 2009 summary judgment order.

## II.

### Standard of Review

■ We review a circuit court's entry of summary judgment *de novo*. Syllabus Point

1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). A party moving for summary judgment faces a well established burden: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Surety Co. v. Federal Insur. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III.

### Discussion

Plaintiff White essentially argues that the circuit court erred in two ways. First, she argues that the circuit court erred by ruling there were no questions of material fact regarding whether Fifth Third Bank breached the construction loan agreement. Second, she argues that the circuit court erred when it concluded that there were no questions of material fact that would allow the plaintiff to recover economic damages from the Bank under a negligence theory.

We examine these two arguments separately.

### A.

### Breach of Contract

■ The plaintiff argues that the construction loan documents created a clear obligation for the Bank: that the Bank would make payments from the loan only after an inspection had been performed to confirm that the construction work being paid for was actually completed and was "in place." The plaintiff asserts that it is just as clear that the Bank made disbursements to the building contractor, WFP, for tasks that inspections showed were not completed or had not been undertaken at all. In sum, the plaintiff contends that there are sufficient questions of material fact in the record to permit her breach of contract claims to be submitted to a jury.[8]

---

**8.** The plaintiff also contends that the Bank was required to give her notice if it discovered problems with a draw request, and that it failed to do so. As evidence of the Bank's duty, the plaintiff cites to a document that she was given when she

signed the loan agreement in January 2005, titled "Disbursement Processing Guide—Questions & Answers." It states that an agent for the Bank would contact the plaintiff "regarding the inspection results and the approved draw amount, *if*

The Bank responds by arguing that the plaintiff's contract claim is precluded by the express terms of the construction loan agreement. The Bank asserts that the loan documents explicitly state that the plaintiff was not entitled to rely upon the inspections performed by the Bank, and state that the plaintiff was "solely responsible for the progress and quality of construction[.]" The Bank therefore contends that the circuit court correctly granted summary judgment on the plaintiff's breach of contract claim.[9]

█ This Court has held on numerous occasions that "[w]here the terms of a contract are clear and unambiguous, they must be applied and not construed." Syllabus Point 2, *Bethlehem Mines Corp. v. Haden*, 153 W.Va. 721, 172 S.E.2d 126 (1969). *In accord*, Syllabus Point 2, *Orteza v. Monongalia County General Hospital*, 173 W.Va. 461, 318 S.E.2d 40 (1984); Syllabus Point 3, *Waddy v. Riggleman*, 216 W.Va. 250, 606 S.E.2d 222 (2004). Moreover, "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." Syllabus Point 3, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1963). *In accord*, Syllabus Point 5,

*Dan's Carworld, LLC v. Serian*, 223 W.Va. 478, 677 S.E.2d 914 (2009).

The loan agreement at issue, while perhaps daunting to the average borrower, is clear and unambiguous. In at least four different places in the loan documents, and often in capital letters, the Bank—the drafter of the loan documents—specifically states that it would not release any loan money unless an inspector had certified that the work being paid for was completed and "in place." As one document states, the Bank "has agreed . . . to disburse funds only FOR WORK IN PLACE, based upon inspection." And, the Bank's duty is expressed in the documentation in mandatory terms, such as "shall" and "will," and not discretionary terms.

Furthermore, the record suggests that the Bank made disbursements of funds for work that inspections showed was not complete, and was not "in place." For example, on November 15, 2005, four days after an inspection found that only $575.00 in work was in place, the Bank wired $5,477.00 to WFP. On January 5, 2006, the Bank paid money to WFP for gutters and downspouts, garage doors, and exterior stairs when an inspection the day before showed those tasks were not completed. It would therefore appear that there are questions for a finder of fact to

*the amount differs from [the] original request."* (Emphasis added). Another document signed by the plaintiff in January 2005 requests that

> . . . all bills and correspondence regarding this loan be sent to the Borrower at the address below, until the construction of the new residence at the mortgage property address is completed.

The document lists the plaintiff's home address in Kanawha County, West Virginia. The plaintiff contends, however, that the Bank either (1) never attempted to notify her that on November 8th and November 11th it had approved draw amounts that differed from the amounts originally requested, or (2) improperly mailed the notifications to the half-built construction site in Lincoln County rather than to the plaintiff's home in Kanawha County.

The appellee Bank asserts that the plaintiff signed an authorization form allowing WFP to act as her agent to receive payments toward construction costs. The Bank therefore contends that it had no duty to send her correspondence, but only a duty to correspond with WFP.

We decline to consider these arguments by the parties. As we are able to conclude that ques-

tions of fact exist by looking to other provisions of the loan documentation, we leave it to the circuit court to consider on remand whether to allow the plaintiff to pursue this alternative theory.

9. The Bank also points out that the plaintiff signed an authorization form allowing WFP to serve as her agent in requesting draws, and that form states that the plaintiff "hereby waives any claims for damages against [the Bank] which might arise or could be claimed as the result of [the Bank] distributing funds directly to the Builder[.]" The Bank asserts that the language of this document absolves the Bank from "any claims for damages" for the loan money it distributed to WFP. We, however, believe this language is irrelevant, since the plaintiff is not basing her breach of contract action on the Bank's "distributing funds directly to the Builder." Instead, the plaintiff's allegation is that the Bank distributed funds for work which the Bank *knew* had not been completed, when it had agreed not to do so.

resolve regarding whether these acts by the Bank constituted a breach of the construction loan agreement.

■ We note that the Bank is correct when it asserts that the loan agreement is clear that the inspections at issue were for the protection of the Bank and not the plaintiff. But, at its essence, the Bank's argument is that the plaintiff cannot fault the Bank for disregarding those inspections and, contrary to the loan agreement, distributing money for work that was not in place. It is well-settled law that "[a] contract must be considered as a whole, effect being given, if possible, to all parts of the instrument." Syllabus, *Clayton v. Nicely,* 116 W.Va. 460, 182 S.E. 569 (1935). The Bank's argument is, essentially, that one part of the construction loan agreement (that the Bank drafted) trumps another part. We reject this argument in favor of an interpretation that gives effect to all parts of the loan agreement.

Likewise, the Bank is again correct when it asserts that the plaintiff was contractually "solely responsible for the progress and quality of construction[.]" However, the plaintiff's argument does not allege that the Bank bore any responsibility for the progress or quality of construction. Instead, the plaintiff is arguing that the Bank should be held responsible for disbursing loan money to pay for certain items, when it knew after inspection that those items had not been completed. Hence, the contractual language cited by the Bank has no application here.

Accordingly, we believe that the circuit court erred in granting summary judgment to Fifth Third Bank on the plaintiff's contract claim. We find that there are genuine issues of material fact as to whether the Bank breached the construction loan agreement. We therefore must reverse the circuit court's order, but only so far as it pertains to the plaintiff's contract claim against the Bank.

### B.

#### *Negligence*

■ The plaintiff also alleges that the Bank was negligent and/or reckless in its handling of the draw requests made by WFP. The plaintiff's argument—which has continually shifted from her complaint to the summary judgment hearing to her appellate brief—appears to be that she has suffered economic harm because the Bank failed to conduct proper inspections of the new house, or did not rely on inspections when they were conducted, or failed to inform the plaintiff that the contractor, WFP, was seeking payment for work that inspections showed had not been completed.

■ In West Virginia, the general rule holds that when a lender breaches its contract with a borrower causing economic loss (but no property damage or personal injuries), the borrower's primary remedy is to pursue a breach of contract action against the lender. However, where the lender and borrower have a "special relationship" that extends beyond the contract, the borrower may recover tort-type damages. *See Glascock v. City National Bank of W.Va.,* 213 W.Va. 61, 576 S.E.2d 540 (2002). In other words, our law allows a negligence claim for purely economic losses when then there is evidence of a "special relationship" between the plaintiff and the defendant. *See Aikens v. Debow,* 208 W.Va. 486, 500, 541 S.E.2d 576, 590 (2000) ("[W]here a special and narrowly defined relationship can be established between the tortfeasor and a plaintiff who was deprived of an economic benefit, the tortfeasor can be held liable."); *Eastern Steel Constructors, Inc. v. City of Salem,* 209 W.Va. 392, 398, 549 S.E.2d 266, 272 (2001) ("[R]ecovery of economic damages should be allowed in certain meritorious claims when an adequate barrier against limitless liability, such as the existence of a special relationship, can be identified[.]").

■ Whether a defendant has a special relationship with a plaintiff, such that the defendant owes a duty of care to the plaintiff, is a determination that must be rendered by a court as a matter of law. Syllabus Point 5, *Aikens v. Debow, supra* ("The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the

court as a matter of law."). In *Aikens,* we set forth the following guidelines for assessing whether a "special relationship" exists:

The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrongdoing, the persons likely to be injured, and the damages likely to be suffered. Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus.

*Eastern Steel Constructors,* 209 W.Va. at 398, 549 S.E.2d at 272 (*quoting Aikens,* 208 W.Va. at 499, 541 S.E.2d at 589). We have not delineated a clear, black-letter rule for when a special relationship does or does not exist, because any "attempt by this Court to more specifically define the parameters of circumstances which may be held to establish a 'special relationship' would create more confusion than clarity." *Aikens,* 208 W.Va. at 500, 541 S.E.2d at 590. Suffice it to say that the existence of a special relationship between two parties "will differ depending upon the facts of each relationship[.]" *Id.*

We held in *Glascock v. City National Bank, supra,* that, in the context of a construction loan agreement, a "special relationship" between the borrower and lender can arise if the lender maintains oversight of, or intervenes in, the quality of the construction process, and then fails to disclose information to the borrower about the quality of the construction project when it is foreseeable that the borrower would be injured.[10] In *Glascock* the borrowers entered into a construction loan agreement with a bank to build a new home. Part of the agreement stated

that "[i]nspections required with respect to this loan are solely for the bank's benefit; borrowers shall receive no comfort or rights with respect to such inspections or bank's evaluation thereof." 213 W.Va. at 63, 576 S.E.2d at 542. Initial inspection reports prepared by the bank revealed many defects in the home. Copies of these reports were given to the borrowers, and the borrowers were able to remedy the problems. The bank, acting alone after the home was completed and without the borrowers' knowledge, hired an inspector who found many additional defects, some of which pertained to safety. The bank did not provide the borrowers with a copy of the inspector's report. Instead, the bank convinced the borrowers to convert the construction loan into a more traditional long-term loan (at a higher interest rate) without revealing the defects contained in the bank inspector's report. The borrowers later claimed that they were damaged by the bank's failure to disclose the final inspection report. The circuit court granted the bank's motion for summary judgment and the borrowers appealed to this Court.

On appeal, we held in *Glascock* that the bank maintained oversight of, and intervened in, the quality of the construction process such that a special relationship existed, and that a jury was entitled to consider whether the bank should have revealed the final inspection report to the borrowers.

The plaintiff in the instant case insists that the circuit court erred in its application of *Glascock* and wrongly concluded that the Bank did not intervene in enough of the construction process to allow a special relationship to exist.[11] We disagree. Our holding in *Glascock* specifically involved whether the lender had "information critical to the integrity of the construction project," such

---

10. We held in Syllabus Point 6 of *Glascock:*

Where a lender making a construction loan to a borrower creates a special relationship with the borrower by maintaining oversight of, or intervening in, the construction process, that relationship brings with it a duty to disclose any information that would be critical to the integrity of the construction project.

11. The plaintiff also argues that the circuit court erred by—initially—refusing to consider whether a special relationship existed, because the plaintiff failed to specifically plead the existence of a special relationship in her complaint. However, the circuit court later relented and, in its summary judgment order, assessed whether a special relationship arose between the plaintiff and the Bank. We therefore do not consider this argument by the plaintiff.

that "withholding that information might damage the borrowers." 213 W.Va. at 67, 576 S.E.2d at 546. In the instant case, we see no evidence that the Bank independently inspected the plaintiff's new home to assess the quality or integrity of the construction, and no evidence that the Bank withheld any information about the quality or integrity of the home from the plaintiff. After carefully reviewing the record, we believe that the circuit court correctly found that the facts in the instant case are distinguishable from those in *Glascock.*

Furthermore, the plaintiff in the instant case has directed us to no facts indicating how the plaintiff was affected differently from society in general, or how the Bank had a specific reason to know of any tort damages or consequences likely to be suffered by the plaintiff above, beyond or different from her losses caused by the alleged breach of contract. *See Glascock,* 213 W.Va. at 66, 576 S.E.2d at 545; *Eastern Steel Constructors,* 209 W.Va. at 398, 549 S.E.2d at 272; *Aikens,* 208 W.Va. at 499, 541 S.E.2d at 589. The plaintiff's allegation against the Bank is, essentially, that the plaintiff has suffered economic losses because the Bank paid out money from the loan that, contractually, it should not have. On the record before us, this Court cannot find that the Bank maintained sufficient oversight of or intervened in the integrity of the construction process so as to create a special relationship. Accordingly, we cannot say that the circuit court erred in finding as a matter of law that no special relationship between the plaintiff and the Bank. Since there appear to be no genuine issues of fact regarding the existence of a special relationship, we affirm the lower court's grant of summary judgment on the plaintiff's tort claims against Fifth Third Bank.

### IV.

### *Conclusion*

For the reasons stated, the February 4, 2009 order of the Circuit Court of Kanawha County is affirmed, in part, reversed, in part, and remanded for a jury's determination on the merits of the breach of contract claim as set forth in the plaintiff's complaint.

Affirmed, in part, reversed, in part, and remanded.